THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mikel, Esq., (SBN 350671)
5100 Campus Drive, Suite 200
Newport Beach, CA 92612
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email; cameron@sehatlaw.com
j.mikel@sehatlaw.com

Attorneys for Plaintiff JUSTIN J. GOSS, individually and CRYSTAL BRANQUINHO, individually

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JUSTIN J. GOSS, individually; and CRYSTAL BRANQUINHO, individually

Plaintiff,

vs.

COUNTY of SAN LUIS OBISPO, a government entity; WELLPATH; a Delaware limited liability company; California Forensic Medical Group, a California corporation; JACOB BLACK, in his individual capacity; AMBER BORTELLO, in her individual capacity; FRANCINE TILLMAN, in her individual capacity; YLLIANA KELLER, in her individual capacity; and DOES 1-10;

Defendants.

Case No.: 2:26-cv-04235

**FIRSTAMENDED COMPLAINT FOR DAMAGES**

1. **Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983, 8th & 14th Am.)**
2. ***Monell*- Unconstitutional Custom, Practice and Policy (42 U.S.C. §1983)**
3. ***Monell*-Failure to Train (42 U.S.C. §1983)**
4. ***Monell*-Ratification (42 U.S.C. §1983)**
5. **Supervisory Liability per (42 U.S.C. § 1983)**
6. **14th Amendment-*State Created Danger***
7. **Negligence –Wrongful Death (State)**
8. **Bane Act C.C. 52.1 Et Seq. (State)**
9. **Failure to Summon Medical Care (California Government Code § 845.6)**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1. Plaintiff, JUSTIN J. GOSS, is an adult who suffered severe physical injuries and is physically disabled but retains legal capacity.

2. CRYSTAL BRANQUINHO is the wife of JUSTIN J. GOSS and assists JUSTIN J. GOSS with virtually all of his activities of daily living.

3. On the night of December 9, 2025 or the early morning hours of December 10, 2025 officers of the Arroyo Grande Police Department (DOE 1 and Defendant Jacob Black) contacted Trisha Roberts, a friend of JUSTIN J. GOSS in an effort to obtain information to assist with arresting GOSS. Ms. Roberts showed officers text messages from GOSS that demonstrated GOSS intended to commit suicide and was actively suicidal.

4. Plaintiff, was arrested on December 11, 2025 by San Luis Obispo Sheriff's deputies and booked in the San Luis Obispo County Jail, operated by the San Luis Obispo County Sheriff's Department. GOSS's jail medical records indicate that the Arroyo Grande officers, JACOB BLACK and DOE 1, that spoke to Trisha Roberts and/or COUNTY deputy, DOE 2, that arrested GOSS, and/or DOE 3, a 911 call dispatcher, did not inform jail medical staff and/or correctional deputies that Mr. GOSS had expressed suicidal intent.

5. Nevertheless, at the time GOSS was booked in the San Luis Obispo County Jail, County correctional deputies and medical staff were aware of that GOSS had previously attempted suicide. Goss had disclosed two prior suicide attempts at the time of his prior bookings in the jail.

6. In addition, it is well known that suicidal individuals sometimes deny having suicidal intent and incarceration is a dynamic risk factor that materially increases the risk that an individual would commit suicide because of increased psychological stress.

7. Here, GOSS was facing serious charges with the potential for long term incarceration. Additionally, Jaylen Martin, an inmate who was a mutual

friend of GOSS and Ms. Roberts and concurrently housed with him, had raised concerns about the risk that Mr. GOSS would commit suicide to a correctional deputy, and specifically warned a deputy/custody assistant to check on GOSS because of these concerns.

8. Despite these known and obvious suicide-risk indicators, including but not limited to recent suicidal statements, prior attempts, methamphetamine-related psychological distress, and warnings from another inmate, County correctional and medical staff failed to conduct adequate suicide-risk assessments, failed to provide appropriate monitoring or housing, and ignored obvious risk factors simply because GOSS allegedly denied that he had current plans to commit suicide.

9. During his jail intake screening on December 11, 2025, Jail medical staff documented multiple suicide-risk indicators, including two prior suicide attempts, daily methamphetamine use, prior psychiatric hospitalization, a positive mental-health screen requiring urgent evaluation. Additionally, classification reported GOSS's odd behavior and a history of self-harm. Over the next 24 hours, three mental-health professionals, Tillman, Bortello, and Keller, each evaluated GOSS, observed symptoms consistent with acute psychological distress, and confirmed his history of suicide attempts. Yet each deferred housing decisions to classification, relied on GOSS's denial of current suicidal ideation, and made no recommendation for suicide-resistant housing, enhanced monitoring, or timely follow-up.

10. On December 13, 2025, Plaintiff attempts suicide by jumping heard first, from the second story of the housing tier. As a result, Plaintiff sustained serious debilitating injuries. Responding deputies and medical staff knew that Mr. Goss had attempted suicide and documented the incident as an attempted suicide rather than any other kind of accident or incident. In fact, they immediately placed on a W&I 5150 hold.

11. Additionally, prior to jumping, and during his incarceration, Plaintiff had at different times walked from his cell to the second-floor tier and looked down as he actively contemplated suicide.

12. More specifically, he approached the edge, hesitated, and returned to his cell without jumping. These numerous episodes were observable to custody staff and should have been detected through routine surveillance and monitoring, particularly in light of the other known suicide risk factors described above.

13. Plaintiff was a pretrial detainee at the time of the incident and brings this action against the County of San Luis Obispo ("COUNTY"), WELLPATH, CFMG, Amber Bortello ("BORTELLO"), Francine Tillman ("TILLMAN"), Ylliana Keller ("KELLER"), and DOES 1-10 for monetary damages to redress for the decedent's injuries resulting from Defendants' deliberate indifference to his constitutional rights and liberties including his serious medical and psychiatric condition. Plaintiff brings this action as a pretrial detainee under the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, for injuries suffered as a result of the Defendants' substantial and deliberate indifference to Decedent's known suicidal and psychiatric state while in their custody. Plaintiff further brings his 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon I and Gordon II (Mary Gordon v. County of Orange et* al. *888 F.3d 1118; Gordon v. Cnty. of Orange, 6 F.4th 961, 970, 72 (9th Cir. 2021) (finding a pre-trial detainee has a right to competent medical screening and direct-view safety checks)*. Plaintiff also state a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident.

14. This is a civil action seeking damages against the Defendants for committing acts under color of law, and depriving Decedent of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants the

County of San Luis Obispo ("COUNTY"),WELLPATH, CFMG, BLACK, BORTELLO, TILLMAN, KELLER, and DOES 1-10 were deliberately indifferent by, without limiting other acts and behaviors: failing to provide psychiatric care, failing to summon medical care and/or hospitalize GOSS, failed to provide anti-psychotic medication, failing to follow its established medical care and treatment protocol; failing to monitor a known and potentially suicidal inmate, failing to follow suicide protocols including failing to conduct an adequate suicide assessment; failing to protect decedent from harm; failing to provide necessary and appropriate medical treatment and, failing to provide necessary and appropriate personnel necessary for the health and welfare of GOSS, who at the time of injury, was a pretrial detainee at the San Luis Obispo County Jail, in San Luis Obispo, California. Defendants deprived the Decedent’s rights as guaranteed by the Fourteenth Amendments to the Constitution of the United States against cruel and unusual punishment.

15. The Defendants, and the San Luis Obispo County Jail and Wellpath/ CFMG medical officials, management and employees violated the decedent’s constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) Failing to communicate/transmit information about an actively suicidal GOSS to the booking agency; (2) Deliberately ignoring and failing to heed to decedent’s serious medical condition, to wit, decedent's obvious and expressed suicidal ideation, (3) Failing to provide reasonable treatment for Decedent’s methamphetamine withdrawals, active psychological distress, and physical pain (4) Deliberately ignoring decedent’s worsening mental health as he showed signs of psychological stress, depression and suicide risk; (5) Failing to monitor Decedent, (6) failing to place him in suicide resistant housing, (7) failing to monitor his actions as he accessed a second floor tier, jumped over, an sustained serious head and shoulder injuries (8) Failing to continuously assess decedent as an active suicide risk (9) Failing to follow the County’s own jail

suicide watch policies for classification and monitoring pretrial detainees, (10) Failing to provide reasonable mental health treatment; and (11) Failing to hospitalize GOSS in a mental health treatment facility where he could be adequately monitored and cared for. Because of the defendants' actions, DECEDENT suffered debilitating physical and emotional injuries which action constituted a clear deprivation of her constitutional rights.

## JURISDICTION AND VENUE

16. This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and the death suffered by the plaintiff's decedent at the hands of defendants.

17. A notice of claim form on behalf of Justin Goss and dated January 21, 2026, was served on the City of Arroyo, pursuant to Government Code §911.2*,* regarding violations of Plaintiff' constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's injuries. On January 27. 2026 the CITY rejected Plaintiff GOSS claim. A second Notice of claim on behalf of CRYSTAL BRANQUINHO was issued on April 20, 2026.

18. A Notice of Claim form dated January 22, 2026, was served on the County of San Luis Obispo, through its Clerk of the Board of Supervisors, pursuant to Government Code §911.2*,* regarding violations of Plaintiff's constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's injuries. On March 11. 2026 the COUNTY rejected Plaintiff GOSS's claim. A second Notice of claim on behalf of CRYSTAL BRANQUINHO was issued on April 17, 2026.

19. Plaintiff, through his counsel also issued a notice of Spoliation to CITY and COUNTY and their representatives on January 25, 2025, requesting to preserve any and all materials including jail video surveillance footage

//

20. This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

21. At all relevant times, the Decedent was an inmate at the San Luis Obispo County Jail operated by the San Luis Obispo County Sheriff's Department, a subsidiary of COUNTY.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

23. At all times relevant to this complaint, Plaintiff, Justin Goss (GOSS or Mr. GOSS) was a pretrial detainee housed at the San Luis Obispo County jail where he sustained serious injuries because of a suicide attempt despite Defendants' knowledge that he was at serious risk for committing suicide.

24. Plaintiff CRYSTAL BRANQUINHO, at all relevant times to this complaint was and is the spouse of Justin Goss and a resident of San Luis Obispo County. BRANQUINHO is asserting claims individually.

25. Defendant County of San Luis Obispo, hereinafter known as "COUNTY", is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

26. The San Luis Obispo County Sheriff's Department is a duly organized public entity, form unknown, existing under the laws of the State of California and is responsible for supervising and operating the correctional facilities in the County of San Luis Obispo and ensuring the health and safety of all inmates and pretrial detainees incarcerated in its corrections facilities.

27. At all relevant times to the Complaint, COUNTY had contracted out its jail correctional medical services to WELLPATH, LLC, a private, for-profit limited liability company and/or California Forensic Medical Group, "CFMG" a private for profit domestic corporation. The claims in this action arose entirely

after the approval of Wellpath's Chapter 11 bankruptcy in the Southern District of Texas.

28. Since upon information and belief California law requires jail medical providers contracting with counties to be physician owned, at all relevant times to the Complaint, CFMG was involved in every contract between Counties in California and WELLPATH, including the contract between COUNTY and WELLPATH in effect at the time of the incident.

29. Defendant Amber Bortello, hereinafter "BORTELLO" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant BORTELLO is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant BORTELLO is being sued in her individual capacity.

30. Defendant Francine Tillman, hereinafter "TILLMAN" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant TILLMAN is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant TILLMAN is being sued in her individual capacity.

31. Defendant Ylliana Keller, hereinafter "KELLER" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant KELLER is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis

Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant KELLER is being sued in her individual capacity.

32. DOE 1 is a police officer employed at all times relevant to this Complaint by the Arroyo Grande Police Department and spoke to Trisha Roberts on December 10, 2025. DOE 1 is a duly authorized employee and agent of the Arroyo Grande Police Department, and was acting within the course and scope of his perspective duties as a police officer with the complete authority and ratification of his principal, the City of Aroyo Grande. DOE 1 is being sued in his individual capacity.

33. Defendant Aroyo Grande City, hereinafter referred to as “CITY” is a governmental agency, and duly organized public entity, form unknown, existing under the laws of the State of California and is responsible for supervising and operating the Aroyo Grande police Department, a subsidiary and employer of DOE 1 and Jacob Black.

34. Defendant Jacob Black, “BLACK” is a police officer employed at all times relevant to this Complaint by the Arroyo Grande Police Department and spoke to Trisha Roberts on December 10, 2025. BLACK is a duly authorized employee and agent of the Arroyo Grande Police Department, and was acting within the course and scope of his perspective duties as a police officer with the complete authority and ratification of his principal, the City of Aroyo Grande. BLACK is being sued in his individual capacity.

35. DOE 2 is a San Luis Obispo County Sheriff’s Department Deputy employed at all times relevant to this Complaint by the COUNTY and was the officer who arrested plaintiff and brought him to the San Luis Obispo County Jail. DOE 2 is a duly authorized employee and agent of the San Luis Obispo Sheriff’s Department, and was acting within the course and scope of his perspective duties as a deputy with the complete authority and ratification of his principal, the

County of San Luis Obispo. DOE 2 is being sued in his individual capacity.

36. DOE 3 is a San Luis Obispo County 911 call dispatcher employed at all times relevant to this Complaint by the COUNTY. DOE 3 is a duly authorized employee and agent of the COUNTY, and was acting within the course and scope of his perspective duties as a dispatcher with the complete authority and ratification of his principal, the County of San Luis Obispo. DOE 3 is being sued in his individual capacity.

37. Defendant DOES 4-5, are employees of the COUNTY, employed and located in the County of San Luis Obispo Jail, and at times relevant to the complaint was employed in the capacity of a correctional deputies and staff. Defendant DOES 4-5 are a duly authorized employees and agents of the San Luis Obispo County Sheriff's Office, and were acting within the course and scope of their perspective duties as jail staff in the San Luis Obispo County Jail with the complete authority and ratification of their principal, COUNTY. Defendant DOES 4-5 are being sued in their individual capacity.

38. Defendant, hereinafter referred to as "DOE 6" is an employee working in the capacity of a jail supervisor and shift commander at the San Luis Obispo County Jail, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of a jail shift commander. Defendant are a duly authorized employees and agent of San Luis Obispo County Jail, and was acting within the course and scope of his perspective duties as inmate jail staff in the San Luis Obispo County Jail with the complete authority and ratification of her principal, COUNTY. Defendant DOE 6 is sued in his individual capacity.

39. Defendant, hereinafter referred to as "DOE 7", is an employee in the capacity of a jail supervisor and watch commander at the San Luis Obispo County Jail, a subsidiary of Defendant COUNTY, and at times relevant to the complaint was employed in the capacity of supervisor and shift commander. Defendant is a

duly authorized employees and agent of San Luis Obispo County Jail, and was acting within the course and scope of her perspective duties as inmate jail staff in the San Luis Obispo County Jail with the complete authority and ratification of her principal, COUNTY. Defendant DOE 7 is sued in his individual capacity.

40. DOES 8 through 10 are employees of WELLPATH and/or CFMG in San Luis Obispo, and at times relevant to the complaint were employed in the capacity of a correctional nurses and medical staff. Defendant DOES 8-10 are a duly authorized employees and agents of the WELLPATH and/or CFMG, and were acting within the course and scope of their perspective duties as jail medical staff in the San Luis Obispo County Jail with the complete authority and ratification of their principal WELLPATH and/or CFMG. Defendant DOES 8-10 are being sued in their individual capacities.

41. At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

**FACTUAL ALLEGATIONS**

42. Mr. GOSS had a known prior history of attempted suicide in 2000. GOSS made a second attempt sometime between 2000 and 2002.

43. Mr. GOSS's prior suicide attempts were noted in his jail medical records maintained by the COUNTY in connection with his incarcerations in the San Luis Obispo County jail in February of 2020 and in October 2025.

44. On December 10, 2025, officers of the Arroyo City Police department officers (Doe 1 and BLACK) contacted Trisha Roberts to obtain information about GOSS. Ms. Roberts answered the officers' questions and informed officers that GOSS was at risk for committing suicide by sharing text messages that she received from him that indicated he intended to end his own life.

//

45. On December 11, 2025, at approximately 2:00 a.m., Mr. GOSS was arrested by DOE 2, a deputy of the San Luis Obispo Sheriff's Department for evading, reckless driving and/or related charges.

46. DOE 2 brought GOSS to the San Luis Obispo County jail.

47. DOE 1, BLACK, DOE 2, and/or DOE 3 failed to communicate GOSS's recent statements of his suicidal intent, i.e. the content of his text messages with any custodial and/or medical staff at the San Luis Obispo County jail.

48. On December 11, 2025 at between 3:36 am and 4:46 am, Nurse Neal Chittenden performed an intake screening of GOSS in connection with his admission to the jail. Chittenden noted, among other things, a prior suicide attempt in 2002 by "cutting/stabbing", "daily meth use" "for greater than a year", a "current or past mental health diagnosis" to wit a "Hx suicide attempt", that Mr. GOSS was "currently taking or supposed to be taking medication for emotional / mental health problems", and "prior hospitalization for psychiatric problems."

49. Chittenden's assessment indicated a "positive screen" in the category: "County Brief Jail Mental Health Screen - SLO," thus requiring a further mental health evaluation which was indicated as "urgent (tomorrow)"

50. In the section "placement/ housing" Chittenden indicated, "other: (per class)."

51. On December 11, 2025 at approximately 9:05 am, Francine Tillman (TILLMAN), a mental health professional and DOE 4 a custodial deputy met GOSS cell-side to complete a brief mental health check-in, following a classification report stated GOSS displayed odd behavior and expressed a history of self-harm. Tillman introduced herself and the purpose for the visit. GOSS described suicide attempts in "2000 and 2002". GOSS denied current homicidal and suicidal intent. He stated his ex-girlfriend is a source of support. In an apparent recognition that incarceration itself increases the risk of suicide, Tillman

reviewed grounding steps like breathing "in the event he becomes overwhelmed with legal worries." TILLMAN also noted, GOSS "appears to be shocked in the jail environment as he expressed some confusion about behavior that led to his arrest." TILLMAN did not make any referrals for any follow up and instead determined that any follow-up treatment should be PRN (*pro re nata*, i.e. as needed) or through sick call. Tillman ended the visit and reported the information to classification.

52. On December 12, 2025, at approximately 10:04 am, Amber Bortello ("BORTELLO") a qualified mental health professional performed a Mental Health Initial Evaluation of GOSS.

53. BORTELLO describes GOSS's mood during the evaluation as "slightly irritated and affect is flat."

54. BORTELLO identified two risk factors including GOSS's gender and two previous suicide attempts. Botello noted GOSS's use of meth and unwillingness to substance abuse program but did not weigh either of these facts as a risk factor.

55. According to BORTELLO, GOSS reported a history of depression and treatment through medication but he could not recall the name of the medication and had apparently discontinued it because he "did not like the way it made him feel." GOSS also complained of anxiety and that he "asks to meet with prescribing provider."

56. BORTELLO obtained the details of GOSS's prior suicide attempts. In 1997 he attempted to end his live "via overdose." Botello then noted, "the second attempt was in 2002 when he cut his wrists." Botello further noted, "after both of these attempts he was placed on a 5150 and subsequently inpatient in SLO."

57. BORTELLO identified protective factors including: future goals and defined plans, "responsibility to family or others; living with family", and

"[s]ocial support (friends)."

58. However, these so-called protective factors were attenuated by GOSS's incarceration because he would (by definition) be physically separated from his friends and family on whom he relied for support.

59. In spite of these facts, BORTELLO indicated GOSS's "current self-harm/ suicide risk level" as low.

60. BORTELLO nevertheless called for a consultation with a Psychiatric-Mental Health Nurse Practitioner to refer GOSS for a Specialized Nursing Intensive Assessment (SNIA) if he meets diagnostic criteria.

61. Critically, in the section housing recommendation section Botello selected "Other (specify): (per class)" indicating that GOSS's housing would be determined by classification and not by her assessment.

62. BORTELLO also selected NA in the section for "other recommendation:" thus missing an opportunity to at minimum alert custodial deputies and medical staff that GOSS required frequent or continuous monitoring to manage the serious and known risk that he could attempt suicide.

63. On December 12, 2025 at approximately 1:11 pm, Plaintiff was brough out of the housing unit to speak to KELLER after GOSS informed staff that we would like to talk with the therapist about his concerns regarding court. Reportedly, GOSS was otherwise answering when talking about his concerns. GOSS expressed he "has a lot of things going on." KELLER noted that GOSS spoke in a monotoned manner, had avoidant eye contact, and shifted weight frequently. These observations are textbook indicators of being 'potentially' suicidal even though GOSS reportedly denied suicidal ideation. Keller then educated GOSS on how to contact mental health in case of an emergency and to notify the officers or to press the emergency intercom in the housing unit. KELLER made a follow up appointment next week but took no other action.

//

64. Additionally, between December 11, 2025 and December 13, 2025 inmate Jaylen Martin repeatedly raised concerns to correctional deputies that GOSS was suicidal. In fact, he warned a deputy, of Hawaiian ethnicity, to check on GOSS as he was concerned that he was psychologically decompensating.

65. In addition, Plaintiff, at different times during his incarceration, had walked from his cell to the second-floor tier, approached the edge, hesitated, and returned to his cell without jumping. These episodes were observable to custody staff and should have been detected through routine surveillance and monitoring, particularly in light of the other known suicide risk factors described above.

66. On December 13, 2025, at approximately 3:35 pm, Plaintiff attempted suicide by jumping from the second story of the housing tier.

67. The reports of Defendants' medical staff prepared immediately after the incident, including a W&I 5150 application, described Plaintiff's actions as an attempted suicide reflecting a collective and immediate understanding of the nature of the event.

68. Plaintiff survived this attempt but suffered serious injuries that will result in lifelong pain and disabilities.

69. Plaintiff's diagnosed injuries resulting from his fall include but are not limited to severe intracranial bleed with subarachnoid hemorrhage, intraparenchymal hematoma, a Skull fracture, Facial fractures including left zygoma, left medial and lateral orbit fractures and right zygoma fracture, Left 2-10 and right 1 through 5 rib fractures, Left hemopneumothorax, a complex Left clavicle fracture, and a Left scapula fracture. Among other things, his injuries required a left chest tube placement, right frontoparietal ventriculostomy and IC placement, MT on presentation, and management of encephalopathy and acute agitation.

70. While a full long-term prognosis is currently premature, GOSS suffers from severe physical and some cognitive limitations including but not

limited to a traumatic brain injury. He has lost his sense of smell and is blind in one eye. He suffers from significant memory issues.

71. He is unable to use his left arm, and he is confined to a wheelchair. He is unable to dress himself, including putting on his pants, shoes, and socks. He cannot shower independently and requires continual assistance which BRANQUINHO provides him with. He is also unable to use the bathroom by himself. He is unable to do the landscaping work he previously did.

72. GOSS needs assistance with virtually all aspects of his daily activities.

73. Additionally, both Chittenden and BORTELLO's assessments of GOSS indicated, "Other (specify): (per class)" in the section "Placement/ Housing Recommendation".

74. Upon information and belief, these notes indicate that as a matter of County policy the ultimate question of where to house GOSS (and similarly situated potentially suicidal inmates) was delegated to classification or at least that the final authority for such a decision was highly ambiguous. This creates a structural delegation problem where medical staff with clinical training lack authority or influence over housing decisions, and thus default to minimal assessments and defer to classification officers who lack clinical training.

75. Classification deputies may have also believed that it is the sole responsibility of medical/mental health staff to determine whether an inmate like GOSS should be housed in a medical observation unit and/or at minimum recommend additional monitoring.

76. As such there is a custom and practice of ambiguity and/or a lack of a clear policy defining who has the ultimate authority to decide the housing of individuals with a heightened risk of suicide.

77. This custom and practice and/or policy of inaction was the moving force behind plaintiff's injuries.

78. The COUNTY was on notice that this and other policies regarding reducing the risk of inmate suicide were constitutionally deficient. (See ¶ 100 through ¶ 107 of this Complaint)

79. GOSS, while in the San Luis Obispo County Jail, had merely been charged with a crime and had not been convicted of anything.

80. Accordingly, GOSS was a pre-trial detainee and thus guaranteed rights pursuant to the due process clause of the Fourteenth Amendment, to objectively reasonable medical care, under Gordon v. County of Orange, 888 F. 3d 1118, 1124-25 (9th Cir. April 2018) & 6 F. 4th 961 (9th Cir. July 2021) *(Gordon I and II).* A pretrial detainee has a further right to receive medical care from Defendants which includes the right to psychiatric treatment. (*Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Circ. 2002). “Just as a prisoner may starve if not fed, he or she suffers or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society. “*Brown v. Plata*, 563 U.S. 493, 131 S. Ct 1910, 1928 (2011).

81. At all relevant times to the complaint, GOSS was and was known to be a potentially suicidal inmate. According to NCCHC (National Commission on Correctional HealthCare), a nationwide governing body which sets standards in correctional healthcare and which counties rely upon in creating jail mental health and medical standards and policies, suicide is the leading cause of death in correctional facilities nationwide. An acutely suicidal inmate should be placed on *constant observation* and not left unmonitored and a non-acutely suicidal inmate (potential or inactive) who expresses current suicidal ideations (eg: a wish to die without a specific threat or plan) and/or has recent prior history of self-destructive behavior should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes. Jail areas where suicidal inmates are monitored should be as suicide resistant as possible.

82. Further many inmates with mental illness have co-occurring substance use disorders.

83. At all material times, and alternatively, the actions and omissions of each Defendants were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedents' and Plaintiff's Rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

68. As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims, Plaintiff sustained the following injuries and damages, past and future, among others:

a. Past and future Pain and suffering
b. Past and future medical care
c. Past and future loss of enjoyment of life
d. All damages and penalties recoverable under 42 U.S.C. 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

## FIRST CLAIM FOR RELIEF

**Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983-14th Amendment of the U.S. Constitution, (Against Defendants TILLMAN, BORTELLO, KELLER and DOES 1-10)**

69. Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 68 of this Complaint with the same force and effect as if fully set forth herein.

70. From the time DECEDENT was booked into the San Luis Obispo County Jail until the time of his death, the Defendants repeatedly denied DECEDENT proper medical care in repeated violation of his 14th Amendment constitutional rights.

71. DOE 1, the Arroyo Gande Police Department officer that spoke to Trisha Roberts and learned that GOSS was suicidal as described above, and/or DOE 2, the SLO County Deputy who arrested GOSS, knew that GOSS had expressed suicidal intent, was at substantial risk for suffering serious harm. DOE 3, a SLO county Dispatcher was allegedly told that GOSS had expressed suicidal intent. Nevertheless DOE 1, BLACK, DOE 2, and DOE 3 made intentional decisions not to communicate to San Luis Obispo Jail custodial deputies and/or jail medical staff that GOSS had expressed suicidal intent at or near the time of his arrest even though that information was critically important to assessing GOSS's suicide risk and determining appropriate preventative measures. In failing to communicate this information BLACK, DOES 1, 2 and 3 each failed to take reasonable measures to abate the risk.

72. Nevertheless, nurse Neal Chittenden performed an initial medical evaluation of GOSS and determined that GOSS was at risk for committing suicide and in need of an urgent mental health evaluation. Among other things Chittenden noted prior suicide attempts, prior hospitalizations for mental health, and medication for mental health problems, and put subsequent jail medical staff, mental health care providers, and custodial deputies on notice that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide.

73. Defendant TILLMAN, a qualified mental health professional then performed a mental health evaluation of GOSS after classification reported that he displayed odd behavior and expressed a history of self-harm. In addition to the risk factors highlighted by Chittenden's earlier examination, GOSS apparently expressed feeling overwhelmed with legal worries and confusion about the behavior that led to his arrest. These facts further put TILLMAN and other defendants on notice that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide. TILLMAN failed to take

reasonable measures to abate this risk by not making any referrals for follow-up and/or any recommendations regarding housing and/or monitoring.

74. Defendant BORTELLO's next mental health professional to evaluate GOSS. BORTELLO's examination revealed further details about GOSS's past suicide attempts and treatment pursuant to 5150.

75. BORTELLO made intentional decisions to under-weigh obvious suicide-risk indicators (including but not limited to prior suicide attempts, methamphetamine use and future withdrawals, the psychological stress of being incarcerated and facing criminal charges, etc.,) and over-rely on purported protective factors that were not protective under the circumstances (the support of family members and friends despite the separation from that support) as well as GOSS's denial of current suicidal ideation, resulting in an objectively unreasonable underestimation of DECEDENT's suicide risk.

76. BORTELLO was nevertheless aware that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide.

77. BORTELLO failed to take reasonable measures to abate this risk by failing to make any recommendation regarding GOSS's housing in the jail or the frequency level of monitoring needed to meaningfully abate the risk.

78. KELLER, also, building on prior assessments, evaluated Mr. Goss after he told staff he wanted to speak to a therapist about his concerns regarding court. GOSS displayed behavior and mannerisms associated with individuals that are potentially suicidal. These observations and combined with the prior assessments put defendants on further notice that GOSS was at substantial risk of committing or attempting to commit suicide. Keller also failed to take reasonable measures to abate this risk by failing to make any recommendations regarding housing and/or monitoring. Instead, KELLER educated GOSS to contact mental health in case of an emergency.

79. Upon information and belief, custodial deputies, DOES 3 through 4, observed other statements and behaviors from GOSS that indicated his suicidal intent and received warnings about this risk from other inmates. DOES 3-4 also observed or should have observed Plaintiff actively contemplating suicide by walking from his cell to the second-floor tier, staring down, and walking away in psychological distress. DOES 3 through 4 made intentional decisions to ignore these warnings and failed to abate the risk by failing to report the same to jail medical and mental health staff.

80. It was objectively unreasonable for these Defendants to ignore the numerous objective signs and symptoms of GOSS's deteriorating condition particularly between GOSS's arrest, his various mental health evaluations, and requests for help. Any diligent custodial deputy, registered nurse, medical doctor, and/or other mental health professional would have been apprised of the serious impending medical condition, and promptly actively monitored GOSS who were both withdrawing from methamphetamine and potentially suicidal. If was further objectively unreasonable to Defendants to house GOSS in a minimal observation housing unit because all defendants knew that the jail was unequipped to provide the level of care, monitoring and treatment that GOSS required in light of his suicidality.

81. Each and all Defendants made numerous intentional decisions regarding the conditions of GOSS's confinement: they failed to conduct adequate suicide risk assessments; they deferred to classification for housing decisions without making any recommendations, they failed to provide reasonable treatment for Decedent's opiate withdrawals and active psychological distress; they failed to actively monitor Decedent to monitor his actions as he slowly climbed onto a second floor tier railing and jumped over, and sustained grave injuries; they failed to continuously assess decedent as an active suicide risk; they failed to follow the County's own jail suicide watch policies for classification and monitoring pretrial

detainees; and they failed to refer him to a higher level of care knowing they were not qualified as mental health treatment unit to address Decedent's active crisis.

82. As a result of the repeated denial of proper medical and psychiatric care, DECEDENT spent his time at the San Luis Obispo County Jail suffering unnecessary psychological turmoil before attempting to take his own life and suffering devastating injuries.

83. The Defendants acted with deliberate indifference to GOSS's serious medical conditions and needs by failing to provide proper medical attention, failing to actively monitor him, and by failing to administer any legitimate suicide assessment evaluations, all while observing and documenting his deteriorating psychological condition.

84. GOSS was deemed to be a pretrial detainee, and such, the Defendants by their act of deliberate indifference in failing to provide medical care to treat GOSS's serious medical condition, the conduct thereof constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

85. All Defendants were deliberately indifferent to the serious medical needs of DECEDENT. It should be adequately clear that a reasonable medical practitioner would comprehend that by denying medical care, GOSS was exposed to undue suffering and the risk of death and grave injury. The Defendant jail officials and WELLPATH individual defendants including DOES 1 to 10, intentionally denied DECEDENT proper medical care by failing to treat, to monitor, to refer to a doctor, or to transfer DECEDENT for proper care, causing him to unduly suffer for approximately 2 days before he committed suicide.

86. Had the Defendants and their employees, agents, and servants, not acted with deliberate indifference to the obvious and serious health needs of GOSS, and provided prompt medical attention, he would not have sustained his injuries.

87. GOSS's injuries were easily avoidable.

88. The aforementioned acts and omissions of the Defendants violated GOSS's constitutional rights guaranteed under 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the United States Constitution. The defendants knew that failing to treat GOSS's worsening medical problems could lead to grave injury and/or a fatality.

89. Accordingly, Defendants each are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983 and to reasonable attorney fees under sect. 1988.

## SECOND CLAIM FOR RELIEF

## MONELL: UNCONSTITUTIONAL POLICIES AND CUSTOMS

## (Against Defendants COUNTY, WELLPATH, AND CFMG*)*

90. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 89 of this Complaint with the same force and effect as if fully set forth herein.

91. At all relevant times, the COUNTY maintained unconstitutional policies, customs, and practices governing suicide-prevention, mental-health assessment, and housing of detainees with known suicide risk.

92. The COUNTY maintained a policy and custom of delegating suicide-risk housing decisions to classification deputies, rather than to trained mental-health professionals. Intake Nurse Chittenden and QMHP BORTELLO both documented "Other (per class)" in the housing recommendation section, reflecting a policy that classification rather than clinical staff actually determined housing for suicidal detainees.

93. This delegation created a structural ambiguity in which mental health staff lacked authority to place suicidal detainees in suicide-resistant housing or observation units, and classification deputies lacked the clinical training to make such determinations. As a result, Plaintiff and similarly situated detainees with

known suicide risk were routinely housed in unsafe units with inadequate monitoring.

94. The COUNTY maintained a policy and custom of relying solely on detainee self-reporting to determine suicide risk, even when objective indicators demonstrated a substantial risk of self-harm. Despite Plaintiff's two prior suicide attempts, daily methamphetamine use, psychiatric history, positive mental-health screen, flat effect, monotone speech, avoidant eye contact, and repeated warnings from inmate Jaylen Martin, COUNTY staff effectively ignored objective risk factors because Plaintiff purportedly denied current suicidal ideation.

95. The COUNTY maintained a policy and custom of failing to conduct adequate suicide-risk assessments. QMHPs TILLMAN, BORTELLO, and KELLER each minimized Plaintiff's risk by under weighing clear risk factors and overweighing protective factors that were at best severely attenuated since Plaintiff was in custody. None recommended suicide-resistant housing, enhanced monitoring, or timely follow-up.

96. The COUNTY maintained a policy and custom of failing to provide structured monitoring for detainees with known suicide risk. Despite multiple risk indicators and a positive mental-health screen requiring urgent evaluation, Plaintiff received no enhanced observation, no safety checks, and no placement in a suicide-resistant cell.

97. The COUNTY maintained a policy and custom of failing to ensure communication of suicide-risk information between arresting officers, intake, classification, custody, and mental-health staff. Even if facts were communicated, each evaluator considered their observations during their evaluations in isolation rather than cumulatively.

98. The COUNTY maintained a policy and custom of failing to place detainees with known suicide risk in suicide-resistant housing, instead housing them in general-population units with access to elevated tiers.

99. These policies and customs were the moving force behind Plaintiff's injuries. Plaintiff was placed in a general-population unit, received no monitoring, and was able to access a second-story tier from which he attempted suicide.

**THE COUNTY WAS ON NOTICE OF CONSTITUTIONALLY DEFICIENT POLICIES REGARDING SUICIDAL INMATES**

100. Before Plaintiff's injuries, a series of suicides and suicide attempts in 2018 triggered a federal DOJ investigation pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997, and the DOJ's resulting findings and settlement placed the County on repeated notice that its suicide-prevention, housing, monitoring, and review systems were systemically deficient.

101. In August 2018, two detainees attempted suicide on the same day; deputies intervened.

102. On September 1, 2018, Michael Nonella died by suicide after a sequence of failures later documented by the DOJ: a missed court-ordered mental-health evaluation, presentation as "extremely depressed and suicidal," brief placement in a suicide-resistant cell, discharge from that cell without an in-person psychiatric evaluation, and transfer to an isolation cell without suicide precautions.

103. These events, occurring within weeks of each other, triggered a federal CRIPA investigation into the County's mental-health care, suicide-prevention practices, and housing/classification systems

104. In August 2021, the DOJ issued formal findings concluding there was reasonable cause to believe the County violated the Constitution through systemic failures in suicide prevention, mental-health care, restrictive housing, and incident review.

105. In January 2025, the County entered into a DOJ Settlement Agreement requiring extensive suicide-prevention reforms, confirming that the

deficiencies identified in the 2018–2021 period were systemic, longstanding, and known to County policymakers.

106. The DOJ required the COUNTY to implement joint custody mental health housing decisions, adhere to QMHP recommendations, provide constant observation for suicidal detainees, conduct structured follow-up, and eliminate reliance on video monitoring, requirements that directly correspond to the failures in Plaintiff's claims.

107. The COUNTY's unconstitutional policies and customs caused Plaintiff's injuries.

**WELLPATH'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL CONDITIONS OF INMATES**

108. Upon information and belief, Wellpath employs more than fifteen thousand people in approximately forty states while accruing nearly $1,500,000,000 in revenue annually. Wellpath was formed in November of 2018 because of a merger between Correct Care Solutions, LLC ("CCS") and Correctional Medical Group Companies.

109. Kenneth McGill resided in the Jefferson County Jail in the State of Colorado in September of 2012. Mr. McGill notified the jail staff that he felt dizzy, had difficulty ambulating, and suffered a persistent headache. Unfortunately, the medical staff at the Jefferson County Jail did not transport Mr. McGill to the hospital until sixteen hours had passed since he reported his symptoms to staff members. A panel of jurors in federal court awarded Mr. McGill more than $11,000,000 in December of 2014. The jury determined that a member of the medical staff exhibited deliberate indifference to the medical needs of Mr. McGill. Also, the jury determined that Wellpath/CCS enforced an unconstitutional policy or custom. Wellpath/CCS acquired the medical contractor in 2014 and was the sole provider of medical treatment at the Jefferson County Jail.

110. Rashod McNulty resided at the Westchester County Jail in New York during January of 2013. Wellpath/CCS medical employees were the sole providers of medical care at the Westchester County Jail. Mr. McNulty initially reported to the jail medical staff that he experienced anxiety and pain in his chest. The medical staff on duty were also aware that Mr. McNulty fell to the ground while walking through a hallway in the jail. Mr. McNulty died of a heart attack in the Westchester County Jail. Mr. McNulty's fiancé asserted a wrongful death claim in federal court in December of 2014. Soon thereafter, in 2015, the New York State Commission on Correction published a report regarding the death of Mr. McNulty. The report emphasized that the medical staff at Westchester County Jail did not adequately manage Mr. McNulty's chest pain complaints. Also, the Commission found that a physician prematurely diagnosed Mr. McNulty with abdominal distress while failing to perform diagnostic tests or physically examine Mr. McNulty. Lastly, the Commission stated that nurses on duty did not take immediate action to provide Mr. McNulty with medical care after he fell in a hallway. The nurses left Mr. McNulty in his cell, although Mr. McNulty's may have survived if he had received emergency medical treatment and been transported promptly to a hospital.

111. Dino Vann Nixon entered benzodiazepine withdrawal in the Forsyth County Jail in Forsyth, Georgia during July of 2013. Mr. Nixon did not receive prescribed medication for three weeks, and he was never assessed by a physician. Mr. Nixon died in the Forsyth County Jail due to complications of benzodiazepine withdrawal. Wellpath/CCS was the sole provider of medical treatment at the Forsyth County Jail in July of 2013. Mr. Nixon's surviving family members filed a civil lawsuit after Mr. Nixon died.

112. David Stojcevski entered drug withdrawal in the Macomb County Jail in Michigan in June of 2014. Unfortunately, Mr. Stojcevski died in the Macomb County Jail due to complications of drug withdrawal. Mr. Stojcevski's

surviving family members filed a civil lawsuit and discovered that Mr. Stojcevski had lost over forty pounds during a two-week period. The sole provider of medical treatment at the Macomb County Jail was Wellpath/CCS.

113. A jury found that Wellpath/CCS violated its contract with Pierce County, Washington and ordered Wellpath/CCS to provide $1,560,000 in financial compensation to Pierce County, Washington. The Pierce County Prosecuting Attorney presented a letter to Wellpath/CCS responding to a demand for payment issued by Wellpath/CCS. The prosecuting attorney noted that Wellpath/CCS did not keep adequate medical records for patients or provide medications to inmates. Also, the letter stated that Wellpath/CCS employees did not address or review inmate requests for medical treatment in a timely manner. The prosecuting attorney further emphasized that Wellpath/CCS employees did not provide basic medical services to inmates, nor did they verify inmate medications during the booking process. The letter drafted by the prosecuting attorney also noted generally that Wellpath/CCS provided a poor quality of medical care to inmates and that inadequate record keeping was pervasive at all levels of the facility. Finally, the prosecuting attorney delineated how Wellpath/CCS experienced constant staff shortages and a lack of trained employees. Pierce County did provide time for Wellpath/CCS to improve the operation of the medical clinic. However, Wellpath/CCS did not bring the medical clinic up to operational standards, and Pierce County documented innumerable mistakes committed by Wellpath/CCS employees. The prosecuting attorney stated the following: "[a] jury would likely find that [Wellpath/CCS's] operation of the jail medical clinic was incompetent, unprofessional and morally reprehensible."

114. Kendra Nelson entered heroin withdrawal in the Portsmouth County Jail in Portsmouth, Virginia in July of 2016. Ms. Nelson's surviving family members filed a civil lawsuit, and they claimed the jail staff and medical staff believed Ms. Nelson was malingering. After less than twenty-four hours in

custody, Ms. Nelson died due to complications of heroin withdrawal. The sole provider of medical treatment at Portsmouth County Jail was Wellpath/CCS.

115. Fulton County, Georgia informed Wellpath/CCS in October of 2017 that it was terminating its contract with Wellpath/CCS. Fulton County noted in its termination letter numerous problems with the medical services provided by Wellpath/CCS. The termination letter stated as follows: "the Fulton County Sheriff's Office has reported five deaths at the Fulton County Jail in the last seventy-five days."

116. Donnie Ray Brown was incarcerated at the Coos County Jail in Oregon in October and November of 2013. Within several hours after being released from the jail, Mr. Brown died of a perforated duodenal ulcer in a hospital. The events gave rise to the case *Linda Mae Paris v. Conmed Healthcare Management, Inc., et al.*, Case No. 6:14-CV-01620-TC. Mr. Brown experienced weakness, leg swelling, stomach pain, vomiting, and shortness of breath. When Mr. Brown began regurgitating blood he was transported to a local hospital. However, the medical staff at the hospital could not prevent Mr. Brown's death.

117. Magistrate Judge Thomas Coffin issued his Findings & Recommendations in November of 2017. Judge Coffin noted an obvious basic requirement of jail medical staff: "a corrections facility has a constitutional obligation provide adequate health care to inmates with serious medical needs." Judge Coffin also stated that the evidence would allow a reasonable jury to conclude that Wellpath/CCS enforced a policy of "failing to adequately staff the Coos County Jail with qualified medical professionals to provide promised health care to inmates." Judge Coffin noted that Wellpath/CCS did not "fulfill the critical role of Medical Director for the Jail as promised in its proposal to Coos County." Also, Judge Coffin's Findings & Recommendations faulted Wellpath/CCS for "ratifying and endorsing the understaffing and constitutionally inadequate medical care provided to Donnie Brown by conducting and adopting findings from a

mandated Mortality & Morbidity Review process that was tainted by material misrepresentations and omissions and which resulted in the conclusion that all [Wellpath/CCS] and Coos County Jail policies were followed and adequate for the situation."

118. Wellpath/CCS provided medical treatment to inmates at the ICE Processing Center in Adelanto, California. The Office of the Inspector General of the Department of Homeland Security transmitted a Management Alert to the facility in September of 2018. The Alert delineated a series of deficiencies with the medical treatment provided by Wellpath/CCS at the ICE Processing Center. The Management Alert noted that ICE reviews regarding the deaths of three detainees at the Adelanto Processing Center contained information regarding insufficient medical care. Overall, the Management Alert concluded that "detainees do not have timely access to proper medical care." After conducting a surprise visit to the facility in May of 2018, the Office of the Inspector General of the Department of Homeland Security noted the following: "we observed two doctors walking through disciplinary segregation and stamping their name on the detainee records, which hang outside each detainee's cell, indicating that they visited with the detainee. However, we observed them doing so without having any contact with 10 of the 14 detainees in disciplinary segregation. For the four detainees a doctor did speak with, the doctor asked if the detainee was "ok" in English, not necessarily a language the detainee understood. We confirmed with guards that these four detainees were non-English speakers, and the doctor left without any acknowledgement or response from the detainee."

119. Jah-Quavious Anderson arrived at the Fresno County Jail on June 22, 2020. He was 29 years old. Mr. Anderson suffered from epilepsy and suffered a seizure while in custody at the Fresno County Jail. The jail officials prevented Mr. Anderson from obtaining his seizure medication and did not provide him with adequate medical treatment. Also, the jail staff did not accommodate Mr.

Anderson's medical condition because they sent Mr. Anderson to general population rather than the medical ward.

120. In *Deloney v. County of Fresno, et al.* No. 1:17-cv-01336-LJO-EPG, 2018 WL 1693383 (E.D. Cal. Apr. 6, 2018), John Mayberry was an inmate at the Fresno County Jail when he died on August 2, 2016. His mother, Wilma Deloney, asserted 42 U.S.C. 1983 claims against the County of Fresno and other defendants. The complaint asserted that Mr. Mayberry was deprived of his constitutional right to life and medical and mental health care for his serious mental health needs. While under the supervision of Defendants in the administrative segregation unit, but not on heightened suicide watch, Mr. Mayberry hanged himself in his cell. Mr. Mayberry was suicidal on multiple occasions at the jail and had been classified on a prior occasion as a high suicide risk at Fresno County Jail. One of the primary claims alleged section 1983 claims for wrongful death for deliberate indifference by all Defendants to Mr. Mayberry's serious medical, physical, and mental health needs during his detention.

121. Separately, in the case of *Hanna ex rel. Henderson v. County of Fresno, et al.* No. 1:14-cv-00142-LJO-SKO, 2014 WL 6685986 (E.D. Cal. Nov. 26, 2014). Dominic Hanna was also a pre-trial detainee at the Fresno County Adult Detention Facility in Fresno, California when he was denied medical care by the jail personnel. Mr. Hanna entered the Fresno County Jail on February 6, 2012, and he had previously been incarcerated in Fresno County and his custodial and medical records contained information regarding his severe and debilitating mental health problems, and suicide attempts. Plaintiff was prescribed Lamictal to treat bipolar disorder, but he never received this medication while in the Fresno County Jail. On February 7, 2012, Mr. Hanna repeatedly pounded the back of his head against the bars of his cell which caused a hematoma, the size of a tennis ball on the back of his head. Plaintiff was placed in a suicide cell but then was

removed to his cell on AJ3 in the Fresno County Jail. Jail staff knew that Mr. Hanna had stuffed socks in his mouth to attempt to asphyxiate himself. On February 9, 2012, Mr. Hanna attempted to commit suicide by stuffing two socks down his throat and ramming his head into the cell wall. Due to the suicide attempt, Mr. Hanna was transported to the hospital and survived, but he suffered severe physical and mental injuries.

122. In Grayson v. County of Fresno, et al., No. 22CECG01628, Nathaniel Grayson was an inmate at the Fresno County Jail. Wellpath employees failed to safeguard against Mr. Grayson's known history of seizures related to alcohol withdrawal. Despite documented risk factors, Wellpath failed to properly assess and monitor Mr. Grayson's condition and withheld needed medications. As a result, on June 11, 2021 at approximately 3:45 p.m., Mr. Grayson was discovered on the floor of a sobering cell after having suffered an alcohol withdrawal-related syncope. Mr. Grayson struck his head causing a severe subdural hematoma with a significant midline shift. Two days later Mr. Grayson was still in a coma. Doctors determined that Mr. Grayson had a very poor prognosis for any recovery and removed him from life support. Mr. Grayson was thirty-five years old.

123. Additionally, WELLPATH was investigated by a Ventura County Grand jury in connection with twenty-five (25) deaths of detained persons in Ventura County detention facilities during the time period from 2016 to 2022. The grand jury found, among other things, a) deficiencies in training regarding suicide prevention, b) that "the medical and behavioral health delivery process in the Ventura County Jails has often been reactive rather than proactive," c) that the intake screening practice and reassessments during incarceration do not always provide a complete evaluation of current medical and behavioral health, and d) that involvement of the public and independent subject matter experts in the review of deaths in jail may reduce the risk of death."

**THIRD CLAIM FOR RELIEF**

**MONELL: FAILURE TO TRAIN AND SUPERVISE**
**(Against COUNTY, WELLPATH, and CFMG)**

124. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 123 of this Complaint with the same force and effect as if fully set forth herein.

125. The COUNTY failed to train and supervise correctional and mental-health staff on suicide-risk assessment, suicide-prevention protocols, and the management of detainees with methamphetamine-related psychiatric symptoms.

126. COUNTY staff were not trained to recognize or act upon objective suicide indicators, including prior attempts, psychiatric history, methamphetamine use, flat affect, monotone speech, avoidant eye contact, agitation, and inmate warnings.

127. COUNTY staff were not trained to conduct adequate suicide-risk assessments. QMHPs under-weighed risk factors, over-credited attenuated protective factors, and failed to recommend suicide-resistant housing or enhanced monitoring.

128. COUNTY staff were not trained to understand that protective factors such as family support are attenuated or unavailable during incarceration and therefore cannot be relied upon to reduce suicide risk.

129. COUNTY staff were not trained to recognize the heightened suicide risk associated with methamphetamine intoxication and withdrawal, including impulsivity, depression, agitation, and denial of suicidal ideation.

130. COUNTY staff were not trained to communicate suicide-risk information across intake, classification, custody, and mental-health units. As a result, critical information documented by intake nurse Chittenden and classification deputies was not acted upon.

131. COUNTY staff were not trained to follow up on positive mental-health screens requiring urgent evaluation, nor to initiate suicide precautions pending evaluation.

132. COUNTY staff were not trained to place detainees with known suicide risk in suicide-resistant housing or to initiate constant observation.

133. The 2025 DOJ Settlement Agreement confirms that the COUNTY's suicide-prevention training was constitutionally deficient. The DOJ required the COUNTY to implement comprehensive training on suicide-risk assessment, monitoring, housing decisions, and communication—training that was absent in Plaintiff's case.

134. The COUNTY's failure to train and supervise its employees was the moving force behind Plaintiff's injuries.

## FOURTH CLAIM FOR RELIEF

## MONELL: RATIFICATION

## (Against COUNTY, WELLPATH, and CFMG)

135. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 134 of this Complaint with the same force and effect as if fully set forth herein.

136. COUNTY, WELLPATH, and CFMG policymakers had actual notice of systemic deficiencies in suicide prevention practices through multiple sources, including the 2018 suicide cluster, the CRIPA investigation, the 2021 DOJ Findings Letter, and the 2025 DOJ Settlement Agreement.

137. The 2021 DOJ Findings Letter identified constitutionally deficient suicide-prevention practices, including inadequate monitoring, inadequate housing decisions, inadequate communication, and inadequate mental-health evaluations that were also a moving force in producing Plaintiff's injuries.

138. The 2025 DOJ Settlement Agreement required the COUNTY to implement specific suicide-prevention reforms, including joint custody mental

health housing decisions, adherence to QMHP recommendations, constant observation for suicidal detainees, structured follow-up, and suicide-resistant housing.

139. Despite this notice, COUNTY policymakers failed to correct the unconstitutional policies and customs described above.

140. COUNTY policymakers ratified the conduct of the employees involved by failing to discipline, retrain, or correct the systemic deficiencies that caused Plaintiff's injuries.

141. COUNTY policymakers acted with deliberate indifference to the known risk that detainees—including Plaintiff—would suffer serious harm or death as a result of these deficiencies.

142. The COUNTY's ratification and deliberate indifference were the moving force behind Plaintiff's injuries.

## FIFTH CLAIM FOR RELIEF

### Supervisory Liability per 42 U.S.C. § 1983

### (Against Defendants DOES 6 and 7)

143. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 142 of this Complaint with the same force and effect as if fully set forth herein.

144. At all times relevant to this Complaint, DOES 6 and 7 were acting under color of state law as San Luis Obispo County Jail Sergeants, shift commander(s), shift supervisors, and as the ranking supervisor(s) to defendant deputies and custody staff.

145. Between December 11 and December 13, 2025, Defendant DOE "6" was aware that GOSS had a history of prior suicide attempts, and had recently expressed suicidal intent, showed other objective signs of suicide risk, and had not been given any medication nor been allowed to see a provider per his own request to see a therapist. Despite being on notice that GOSS was at a heightened suicide

risk, DOE "6" *orders* GOSS to be housed in general population without any additional monitoring. DOE 6, who orders WELLPATH nursing staff and mental health staff to house GOSS in general population without additional monitoring. GOSS's mental health evaluations revealed that he demonstrated objective signs of being a heightened suicide risk. As a shift supervisor, DOE 6 was also responsible for maintaining a system where at-risk individuals are placed in suicide resistant cells.

146. Doe 6 failed to ensure collaboration between jail nurses, QMHP's, classification, and other custodial deputies.

147. On December 13, 2025, DOE "7", who was acting as a shift commander and supervisor in charge of deputy and custody staff at GOSS's housing unit, was responsible for inmates' welfare and safety and to ensure all inmates and particularly inmates at risk of suicide were being observed and monitored. DOE 7 failed to order a careful watch and monitoring of GOSS in the tier and failed to ensure that GOSS who had recently and repeatedly expressly an intent to commit suicide was called in lower trier removing the threat of a 2nd story height would pose.

148. Defendants DOES 6, and 7's conduct was so closely related to the deprivation of GOSS's right to be the moving force that caused the constitutional violation, injuries and death.

149. As a direct and legal result of Defendants' acts, Plaintiff suffered damages, including, without limitation, past and future pain and suffering, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## SIXTH CLAIM FOR RELIEF

### 14th Amendment-*State Created Danger*

### (Against TILLMAN, BORTELLO, KELLER, and DOES 1-10)

150. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 149 of this Complaint with the same force and effect as if fully set forth herein.

151. Under the Fourteenth Amendment, GOSS had the constitutional right to be free from defendants' affirmative action of placing him in a position of actual, particularized danger. In this case, defendants knew of GOSS's medical distress, crisis and acute suicidality. Specifically, Defendants and each of them were aware of GOSS's prior suicide attempts and his recent statements that he intended to kill himself.

152. Defendants were actively aware of the severity of GOSS's suicidality, in light of his past suicide watch history and expressed statement indicating he was intended to commit suicide while inside the jail. This critical information was nevertheless under considered by defendants' assessments and decision to house GOSS in general population with minimal supervision. Unless, GOSS was actively medicated and under continuous observation, or sent out for higher level of care such as a psychiatric facility, he would be in grave danger if left unattended within the jail setting.

153. While in-custody, GOSS was in the defendants' care and custody, and as such, Defendants had an affirmative duty not to expose GOSS to more danger than he would have been prior to their encounter.

154. By blatantly denying GOSS help for his suicide crisis, and denying him admission to a mental health facility, when it is obvious he needed to be hospitalized, by failing to conduct proper suicide assessments, by leaving him in a general population with easy access to the second floor of the tier, all the while failing to monitor him, Defendants made an affirmative decisions which placed the GOSS is a position far worse than he was before being placed into the custody and care of the defendants.

155. Defendants' affirmative acts created a foreseeable risk that GOSS would be in grave danger of committing suicide without the proper medical treatment and referral to a higher level of care.

156. Accordingly, Defendants each are liable to Plaintiff S.V. for compensatory and punitive damages under 42 U.S.C. § 1983 and the 14th Amendment, as well as for compensatory damages.

**SEVENTH CLAIM FOR RELIEF**

**NEGLIGENCE**

**(On behalf of Plaintiff and Asserted against, CFMG, BLACK, TILLMAN, BORTELLO, KELLER and DOES 1-10)**

157. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 156 of this Complaint with the same force and effect as if fully set forth herein.

158. Defendants, and each of them, have a duty to operate and manage the San Luis Obispo County Jail in a manner to prevent the acts and/or omissions alleged herein. Said defendants owed GOSS, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

159. Defendants DOE 1, Officer BLACK, DOE 2 and DOE 3 each had a duty of care to take reasonable steps to ensure GOSS's safety by insuring critically important information, to wit, GOSS's active suicidal intent was communicated to custodial and/or medical staff at the San Luis Obispo County Jail. Each of these defendants breached this duty and failed to communicate this information.

160. Defendants DOES 4 and 5, and DOES 6 and 7 were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail deputies and supervisors to DECEDENT. It was foreseeable that as a result of Defendants' acts and omissions, as described above, DECEDENT'S symptoms of suicidality and his co-morbid methamphetamine

withdrawal would worsen, resulting in his physical injury, suffering, and attempted suicide. Defendants' breach proximately caused injuries and damage to DECEDENT as Plaintiff claim herein.

161. DOES 8-10 were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail medical staff by failing to monitor, report, and respond to GOSS's distressed behavior and other objective signs that he was at risk of suicide.

162. Defendants TILLMAN, BORTELLO, and KELLER were each negligent in that each's individual conduct fell below the standard of care for a reasonable qualified mental health professional when discharging their duties jail mental health staff.

163. Defendants TILLMAN, BORTELLO, and KELLER each owed plaintiff a duty of to exercise the level of skill, knowledge, and care ordinarily possessed and exercised by reasonably prudent mental health professionals under similar circumstances, including the duty to conduct adequate suicide-risk assessments, properly weigh known risk factors, act on objective indicators of psychiatric distress, communicate risk information, and recommend appropriate monitoring, housing, and follow-up care.

164. TILLMAN, BORTELLO, and KELLER each breached their duties of care by failing to conduct adequate suicide-risk assessments, failing to properly weigh Plaintiff's known risk factors particularly his prior history of suicide attempts and recent statements of suicidal intent, over-crediting protective factors that were unavailable in custody, failing to act on Plaintiff's methamphetamine-related risk factors, failing to act on repeated warnings from another inmate, incorrectly assessing Plaintiff as at low risk for suicide, failing to provide anti-depression and anti-psychotic medication, failing to refer to a provider or psychiatrist in light of Decedent's own request, failing to recommend

suicide-resistant housing or enhanced monitoring, and failing to recommend timely follow-up or emergency intervention.

165. As a direct and proximate result of the defendants' aforementioned conduct and breaches of the various duties owed to GOSS, Plaintiffs suffered damages. The defendants are liable to GOSS for damages including but not limited to past and future medical expenses, past and future pain and suffering and loss of enjoyment of life.

166. The defendants are also liable to CRYSTAL BRANQUINHO for the loss of her spouse's love, companionship, comfort, care, assistance, protection, and marital relations. Additionally, she has incurred, and will continue to incur, losses including but not limited to: the loss of personal services previously provided by her spouse; the value of caregiving services she has rendered and will be required to render in the future; loss of financial support and earnings attributable to her spouse's diminished capacity; and expenses associated with obtaining substitute domestic, household, and caregiving services. These damages are ongoing in nature, and Claimant seeks recovery accordingly.

167. Plaintiffs also assert punitive damages against named COUNTY defendants for conduct that amounts to recklessness, maliciousness and oppressiveness.

**<u>EIGTH CLAIM FOR RELIEF</u>**

**BANE ACT C.C. 52.1 Et Seq. (State)**

**(On behalf of Plaintiff and Asserted against COUNTY, WELLPATH, CFMG, TILLMAN, BORTELLO, KELLER and DOES 1—10)**

168. Plaintiff hereby repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 167 of this Complaint with the same force and effect as if fully set forth herein. California Civil Code, Section 52.1 (the Bane Act), prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional

rights. However, under *Reese v. Cnty of Sacramento*, 888 F.3d 1030, 1042-4043 (9th Cir. 2018), the Bane Act does not require the "threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation Alleged.

169. Specific intent does not require a showing that a defendant knew he was acting unlawfully; reckless disregard of the right at issue is all that is necessary. [1]*Luttrell v. Hart*, 2020 WL 5642613.

170. On information and belief, Defendants while working for the COUNTY and acting within the course and scope of their duties, denied GOSS necessary healthcare that could have prevented his death. All defendants were deliberately indifferent toward GOSS when they chose to ignore his critical suicidal condition.

171. First, Defendants TILLMAN, BORTELLO, and KELLER knew that each was responding to a potentially suicidal inmate but completely deferred to classification regarding GOSS's housing and monitoring.

172. Defendants' actions placed GOSS in an understaffed county facility that was not equipped to provide the necessary suicide prevention treatment.

173. At the understaffed county facility, GOSS was placed in general population with no additional monitoring.

174. With no medical justification, Defendant DOE "5", the Day Shift Commander, ordered GOSS be placed in general population.

175. BORTELLO indicated that GOSS had a low self-harm risk and made no recommendation that GOSS be placed in a suicide resistant cell and or be subject to additional monitoring.

---

[1] Per *Luttrell*, if a Plaintiff adequately pleads a claim for deliberate indifference which requires a pleading of reckless disregard, then he was sufficiently alleged the "intent" element required for the Bane Act. Under *Reese*, "a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of that right. Some courts such as *Polance v. California 2022 WL 1539784, at*4 (N.D. Cal. May 16, 2022)* have deemed the application of the Bane Act appropriate when there is a showing of deliberate indifference toward correctional inmates ("observing that "defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as the custody context makes that violation especially coercive" and collecting

176. TILLMAN and KELLER similarly failed to make any preventative recommendations.

177. Neither Supervisor Doe 5 or any other Defendant ensured that housing and suicide prevention measures were decided in collaboration between classification and jail mental health staff. As a result, GOSS, a suicidal inmate was placed in a solo, general population cell with access to the second floor of the tier.

178. When Defendants committed the above acts, they acted with the specific intent required under the Bane Act. Defendants intentionally and spitefully committed the above acts to deny GOSS the necessary healthcare that could have prevented his catastrophic injuries.

179. GOSS reasonably believed and understood that he was being denied the right to adequate healthcare.

180. Defendants successfully interfered with GOSS's civil rights.

181. The conduct of Defendants was a substantial factor in causing Plaintiff's harm, losses, injuries, and damages.

182. Defendants COUNTY, WELLPATH and CRMG are each vicariously liable for their respective employees under California law and the doctrine of respondeat superior.

183. Defendants TILLMAN, BORTELLO, KELLER, and DOES 1—10 while working for COUNTY, WELLPATH, and/or CFMG and acting within the course and scope of their duties, denied GOSS necessary healthcare and custodial safety that to degree of reasonable certainty, would have prevented his injuries.

184. When Defendants committed the above acts, they interfered with GOSS's civil rights to due process, to equal protection of the laws, to constitutionally adequate medical care, to be free from state actions that shock the conscience, and to life, liberty, and property.

185. Defendants intentionally and spitefully committed the above acts to deny GOSS the necessary healthcare that would have prevented his injuries.

186. GOSS reasonably believed and understood that he was being denied the right to constitutionally adequate healthcare.

187. Defendants successfully interfered with GOSS's civil rights.

188. The conduct of Defendants was a substantial factor in causing Plaintiff' harms, losses, injuries, and damages.

189. Plaintiff brings this claim for compensatory damages and also seeks punitive damages and attorneys' fees under this claim.

## NINTH CLAIM FOR RELIEF

**Failure to Summon Medical Care Per G.C. §845.6 AND §844.6**

**(Asserted against COUNTY, and DOES 1-2 and 3-4)**

190. Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 189 of this Complaint with the same force and effect as if fully set forth herein.

191. California Government Code § 845.6 creates an affirmative duty for jail staff "to furnish or obtain medical care for a prisoner in his custody." GOSS desperately required prompt medical attention from Defendants, San Luis Obispo County Jail staff. Defendants had actual knowledge of GOSS's need for immediate medical care and deliberately chose to not furnish him with medical care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6. As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, GOSS suffered deteriorating mental health, severe methamphetamine withdrawal resulting in his attempted suicide and devastating injuries.

192. Additionally, Defendants failed to perform their mandatory duty under California Government Code § 845.6 to provide medical care to GOSS even though Defendants had actual knowledge that he needed urgent medical care for his serious medical conditions comprising of her severe methamphetamine

withdrawal deteriorating mental and physical health and associated symptoms, and suicidal ideation.

193. Defendants are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of *respondeat superior*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in their favor and against all Defendants, and DOES 1 through 10, inclusive, as follows:

1. For compensatory damages according to proof, including compensatory damages for past and future medical care, past and future pain and suffering, and loss of enjoyment of life under state common law and under the 14th Amendment parental interference cause of action;
2. For punitive damages against the individual defendants in an amount to be proven at trial;
3. For interest;
4. For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and per the Bane Act's attorney fees provision
5. For such further other relief as the Court may deem just, proper, and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

Date: May 22, 2026 THE SEHAT LAW FIRM, PL

By*: /s/ Jeffrey Mikel*________
Cameron Sehat, Esq.
Jeffrey Mikel, Esq
Attorneys for Plaintiff,
Justin J. Goss and Crystal Branquinho