THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mikel, Esq., (SBN 350671)
5100 Campus Drive, Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email; cameron@sehatlaw.com
j.mikel@sehatlaw.com

Attorneys for Plaintiff JUSTIN J. GOSS, individually and CRYSTAL BRANQUINHO, individually

**1UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JUSTIN J. GOSS, individually; and CRYSTAL BRANQUINHO, individually

Plaintiff,

vs.

COUNTY of SAN LUIS OBISPO, a government entity; WELLPATH; a Delaware limited liability company; California Forensic Medical Group, a California corporation; AMBER BORTELLO, in her individual capacity; FRANCINE TILLMAN, in her individual capacity; YLLIANA KELLER, in her individual capacity; JOSH MOLINA, in his individual capacity; ANGEL TORRES, in his individual capacity; CASEY VERT, in his individual capacity; AMANDA DWYER, in her individual capacity; WILLIE STORMS, in his individual capacity; ERIC BORDEN, in his individual capacity; and DOES 2, 4-5, and 8-10;

Case No.: 2:26-cv-04235-SB-RAO

**FOURTH AMENDED COMPLAINT**

**FOR DAMAGES**

1. **Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983, 8th & 14th Am.)**
2. ***Monell*- Unconstitutional Custom, Practice and Policy (42 U.S.C. §1983)**
3. ***Monell*-Failure to Train (42 U.S.C. §1983)**
4. ***Monell*-Ratification (42 U.S.C. §1983)**
5. **Supervisory Liability per (42 U.S.C. § 1983)**
6. **Negligence (State)**
7. **Bane Act C.C. 52.1 Et Seq. (State)**
8. **Failure to Summon Medical Care (California Government Code § 845.6)**
9. **Loss of Consortium**

**DEMAND FOR JURY TRIAL**

Defendants.

## PRELIMINARY STATEMENT

1. Plaintiff, JUSTIN J. GOSS, is an adult who suffered severe physical injuries and is physically disabled but retains legal capacity.

2. CRYSTAL BRANQUINHO is the wife of JUSTIN J. GOSS and assists JUSTIN J. GOSS with virtually all of his activities of daily living.

3. On the night of December 9, 2025 or the early morning hours of December 10, 2025 officers of the Arroyo Grande Police Department Officer Jacob Black contacted Trisha Roberts, a friend of JUSTIN J. GOSS in an effort to obtain information to assist with arresting GOSS. Ms. Roberts showed officers text messages from GOSS that demonstrated GOSS intended to commit suicide and was actively suicidal. Officer Black purportedly informed dispatch that Mr. Goss had expressed recent suicidal intent.

4. Plaintiff, was arrested on December 11, 2025 by San Luis Obispo Sheriff's deputies. At the scene of his arrest, Sheriff's Deputy JOSH MOLINA ("MOLINA"), or another deputy or investigator acting with him, questioned whether he was currently suicidal. Goss denied being actively suicidal because he was "in cuffs" and "surrounded by cops." the deputy then asked whether he had tried to kill himself while driving and he responded "no but only because he had a passenger in his vehicle." the deputy then told him "not to say that too loud." A County dispatcher had broadcast over the radio that GOSS may be suicidal, and MOLINA was aware of that information. Neither MOLINA nor dispatch communicated these facts to jail medical or custodial staff.

5. Nevertheless, at the time GOSS was booked in the San Luis Obispo County Jail, County correctional deputies and medical staff were aware of that GOSS had previously attempted suicide. Goss had disclosed two prior suicide attempts at the time of his prior bookings in the jail. Whether or not Goss's

statements after his arrest were communicated to jail medical and custodial staff, it was evident from the unsafe driving that led to Mr. GOSS's arrest that he had a recent prior history of self-destructive behavior.

6. In addition, it is well known that suicidal individuals sometimes deny having suicidal intent and incarceration is a dynamic risk factor that materially increases the risk that an individual would commit suicide because of increased psychological stress.

7. Here, GOSS was facing serious charges with the potential for long term incarceration. Additionally, Jaylen Martin, an inmate who was a mutual friend of GOSS and Ms. Roberts and concurrently housed in the same jail, had raised concerns about the risk that Mr. GOSS would commit suicide to a correctional deputy, and specifically warned a deputy/custody assistant to check on GOSS because of these concerns.

8. Despite these known and obvious suicide-risk indicators, including but not limited to recent suicidal statements, prior attempts, a recent prior history of self-destructive behavior, methamphetamine-related psychological distress, and warnings from another inmate, County correctional and medical staff failed to conduct adequate suicide-risk assessments, failed to provide appropriate monitoring or housing, and ignored obvious risk factors simply because GOSS allegedly denied that he had current plans to commit suicide.

9. During his jail intake screening on December 11, 2025, Jail medical staff documented multiple suicide-risk indicators, including two prior suicide attempts, daily methamphetamine use, prior psychiatric hospitalization, a positive mental-health screen requiring urgent evaluation. Additionally, classification reported GOSS's odd behavior and a history of self-harm. Over the next 24 hours, three mental-health professionals, Tillman, Bortello, and Keller, each evaluated GOSS, observed symptoms consistent with acute psychological distress, and confirmed his history of suicide attempts. The intake nurse as well as Tillman,

Bortello, and Keller each asked Goss whether he was currently suicidal. Each time GOSS responded, not with an outright denial but by stating, “not at this moment but ask me again in two days,” or words to that effect. At most, Goss’s responses addressed only whether he was acutely suicidal at that particular moment and should not have been treated as a straightforward denial of suicidal ideation or risk. At a minimum, it called for basic follow-up questioning concerning recent suicidal thoughts, their frequency and severity, particularly given his history of prior suicide attempts, and the recent history of self-destructive behavior that led to his arrest. Yet each deferred housing decisions to classification, relied on GOSS’s denial of current suicidal ideation, and made no recommendation for suicide-resistant housing, enhanced monitoring, or timely follow-up.

10. On December 13, 2025, Plaintiff attempts suicide by jumping head first, from the second story of the housing tier. As a result, Plaintiff sustained serious debilitating injuries. Responding deputies and medical staff knew that Mr. Goss had attempted suicide and documented the incident as an attempted suicide rather than any other kind of accident or incident. In fact, they immediately placed him on a W&I 5150 hold.

11. Additionally, prior to jumping, and during his incarceration, Plaintiff had at different times walked from his cell to the second-floor tier and looked down as he actively contemplated suicide.

12. More specifically, he approached the edge, hesitated, and returned to his cell without jumping. In one instance, he shouted an expletive out loud, verbally he berated himself for not jumping, and stated, “you just got to do this.” These numerous episodes were observable to custody staff and should have been detected through routine surveillance and monitoring, particularly in light of the other known suicide risk factors described above.

13. Plaintiff was a pretrial detainee at the time of the incident and brings this action against the County of San Luis Obispo ("COUNTY"), WELLPATH,

CFMG, Amber Bortello ("BORTELLO"), Francine Tillman ("TILLMAN"), Ylliana Keller ("KELLER"), Josh Molina ("MOLINA"), Angel Torres ("TORRES"), Casey Vert ("VERT"), Amanda Dwyer ("DWYER"), Willie Storms ("STORMS"), Eric Borden ("BORDEN"), and DOES 2, 4-5, and 8-10 for monetary damages to redress for GOSS' injuries resulting from Defendants' deliberate indifference to his constitutional rights and liberties including his serious medical and psychiatric condition. Plaintiff brings this action as a pretrial detainee under the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, for injuries suffered as a result of the Defendants' substantial and deliberate indifference to GOSS' known suicidal and psychiatric state while in their custody. Plaintiff further brings his 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon I and Gordon II (Mary Gordon v. County of Orange et* al. *888 F.3d 1118; Gordon v. Cnty. of Orange, 6 F.4th 961, 970, 72 (9th Cir. 2021) (finding a pre-trial detainee has a right to competent medical screening and direct-view safety checks)*. Plaintiff also state a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident.

14. This is a civil action seeking damages against the Defendants for committing acts under color of law, and depriving GOSS of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants the County of San Luis Obispo ("COUNTY"),WELLPATH, CFMG, BORTELLO, TILLMAN, KELLER, MOLINA, TORRES, VERT, DWYER, STORMS, BORDEN, and DOES 2, 4-5, and 8-10 were deliberately indifferent by, without limiting other acts and behaviors: failing to provide psychiatric care, failing to summon medical care and/or hospitalize GOSS, failed to provide anti-psychotic medication, failing to follow its established medical care and treatment protocol; failing to monitor a known and potentially suicidal inmate, failing to follow

suicide protocols including failing to conduct an adequate suicide assessment; failing to protect GOSS from harm; failing to provide necessary and appropriate medical treatment and, failing to provide necessary and appropriate personnel necessary for the health and welfare of GOSS, who at the time of injury, was a pretrial detainee at the San Luis Obispo County Jail, in San Luis Obispo, California. Defendants deprived the GOSS' rights as guaranteed by the Fourteenth Amendments to the Constitution of the United States against cruel and unusual punishment.

15. The Defendants, and the San Luis Obispo County Jail and Wellpath/ CFMG medical officials, management and employees violated GOSS' constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) Failing to communicate/transmit information about an actively suicidal GOSS to jail medical and custodial staff; (2) Deliberately ignoring and failing to heed to GOSS' serious medical condition, to wit, his obvious and expressed suicidal ideation; (3) Failing to provide reasonable treatment for his methamphetamine withdrawals, active psychological distress, and physical pain; (4) Deliberately ignoring his worsening mental health as he showed signs of psychological stress, depression and suicide risk; (5) Failing to monitor him; (6) failing to place him in suicide resistant housing; (7) failing to monitor his actions as he accessed a second floor tier, jumped over, an sustained serious head and shoulder injuries; (8) Failing to continuously assess GOSS as an active suicide risk; (9) Failing to follow the County's own jail suicide watch policies for classification and monitoring pretrial detainees; (10) Failing to provide reasonable mental health treatment; and (11) Failing to hospitalize GOSS in a mental health treatment facility where he could be adequately monitored and cared for. Because of the defendants' actions, GOSS suffered debilitating physical and emotional injuries which action constituted a clear deprivation of his constitutional rights.

## JURISDICTION AND VENUE

16. This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries suffered by GOSS at the hands of defendants.

17. A notice of claim form on behalf of Justin Goss and dated January 21, 2026, was served on the City of Arroyo, pursuant to Government Code §911.2, regarding violations of Plaintiff' constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's injuries. On January 27. 2026 the CITY rejected Plaintiff GOSS claim. A second Notice of claim on behalf of Crystal Branquinho was issued on April 20, 2026.

18. A Notice of Claim form dated January 22, 2026, was served on the County of San Luis Obispo, through its Clerk of the Board of Supervisors, pursuant to Government Code §911.2, regarding violations of Plaintiff's constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's injuries. On March 11. 2026 the COUNTY rejected Plaintiff GOSS's claim. A second Notice of claim on behalf of Crystal Branquinho was issued on April 17, 2026 and was rejected on May 11, 2026.

19. Plaintiff, through his counsel also issued a notice of Spoliation to CITY and COUNTY and their representatives on January 25, 2025, requesting to preserve any and all materials including jail video surveillance footage

20. This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

21. At all relevant times, the GOSS was an inmate at the San Luis Obispo County Jail operated by the San Luis Obispo County Sheriff's Department, a subsidiary of COUNTY.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

23. At all times relevant to this complaint, Plaintiff, Justin Goss (GOSS or Mr. GOSS) was a pretrial detainee housed at the San Luis Obispo County jail where he sustained serious injuries because of a suicide attempt despite Defendants' knowledge that he was at serious risk for committing suicide.

24. Plaintiff Crystal Branquinho, at all relevant times to this complaint was and is the spouse of Justin Goss and a resident of San Luis Obispo County. BRANQUINHO is asserting claims individually.

25. Defendant County of San Luis Obispo, hereinafter known as "COUNTY", is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

26. The San Luis Obispo County Sheriff's Department is a duly organized public entity, form unknown, existing under the laws of the State of California and is responsible for supervising and operating the correctional facilities in the County of San Luis Obispo and ensuring the health and safety of all inmates and pretrial detainees incarcerated in its corrections facilities.

27. At all relevant times to the Complaint, COUNTY had contracted out its jail correctional medical services to WELLPATH, LLC, a private, for-profit limited liability company and/or California Forensic Medical Group, "CFMG" a private for profit domestic corporation. The claims in this action arose entirely after the approval of Wellpath's Chapter 11 bankruptcy in the Southern District of Texas.

28. Since Cal Code Regs § 1343(b) requires "Each shareholder, director, or officer must hold a valid physician's and surgeon's certificate or a certificate to practice podiatric medicine, except where statutory exceptions apply" and since CFMG is physician owned and WELLPATH is not, WELLPATH effectively does business in California through a management service agreement with CFMG which is the provider that directly contracts with the Counties. Pursuant to this

agreement, WELLPATH typically provides training, training materials, and policies to CFMG and its employees. Often the training materials given to jail medical staff has the name 'WELLPATH' in the title.

29. Defendant Amber Bortello, hereinafter "BORTELLO" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant BORTELLO is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant BORTELLO is being sued in her individual capacity.

30. Defendant Francine Tillman, hereinafter "TILLMAN" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant TILLMAN is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant TILLMAN is being sued in her individual capacity.

31. Defendant Ylliana Keller, hereinafter "KELLER" is a mental health professional and an employee of defendants CFMG and/or WELLPATH. Defendant KELLER is a duly authorized employee and agent of CFMG and/or WELLPATH, and was acting within the course and scope of her perspective duties as correctional nurse or other mental health professional at the San Luis Obispo County Jail with the complete authority and ratification of her principal, CFMG and/or WELLPATH. Defendant KELLER is being sued in her individual capacity.

32. Defendant JOSH MOLINA ("MOLINA") is, and at all times relevant

to this Complaint was, a San Luis Obispo County Sheriff's Deputy employed by the COUNTY. MOLINA arrested GOSS on December 11, 2025, and was one of the deputies who brought him to the San Luis Obispo County Jail. MOLINA is a duly authorized employee and agent of the San Luis Obispo County Sheriff's Office and was acting under color of state law and within the course and scope of his duties as a deputy, with the complete authority and ratification of his principal, the COUNTY. MOLINA was previously sued herein as DOE 1. MOLINA is sued in his individual capacity.

33. DOE 2 is a San Luis Obispo County 911 call dispatcher employed at all times relevant to this Complaint by the COUNTY. DOE 2 is a duly authorized employee and agent of the COUNTY, and was acting within the course and scope of his perspective duties as a dispatcher with the complete authority and ratification of his principal, the County of San Luis Obispo. DOE 2 is being sued in his individual capacity.

34. Defendant ANGEL TORRES ("TORRES") is, and at all times relevant to this Complaint was, a Classification Deputy employed by the COUNTY at the San Luis Obispo County Jail. TORRES interviewed GOSS for classification on December 11, 2025, and determined his housing placement. According to the COUNTY, TORRES had final authority over GOSS's housing assignment. TORRES is a duly authorized employee and agent of the San Luis Obispo County Sheriff's Office and was acting under color of state law and within the course and scope of his duties, with the complete authority and ratification of his principal, the COUNTY. TORRES was previously sued herein as DOE 3. TORRES is sued in his individual capacity.

35. Defendants WILLIE STORMS ("STORMS") and ERIC BORDEN ("BORDEN") are, and at all times relevant to this Complaint were, Custody Deputies employed by the COUNTY at the San Luis Obispo County Jail. STORMS and BORDEN were the custody deputies assigned to GOSS's housing

unit, West Dorm 800, on December 13, 2025, including at the time of GOSS's suicide attempt. STORMS and BORDEN are duly authorized employees and agents of the San Luis Obispo County Sheriff's Office and were acting under color of state law and within the course and scope of their duties, with the complete authority and ratification of their principal, the COUNTY. STORMS and BORDEN were among the custodial deputies previously sued herein as DOES 4 and 5. STORMS and BORDEN are sued in their individual capacities.

36. Defendants DOES 4 and 5 are employees of the COUNTY who at all times relevant to this Complaint worked as correctional deputies and custody staff at the San Luis Obispo County Jail, including the custodial deputy who accompanied TILLMAN on December 11, 2025, any other deputies assigned to GOSS's housing unit, West Dorm 800, between December 11 and 13, 2025, and the custodial deputies who received warnings about GOSS's risk of suicide from other inmates. DOES 4 and 5 are duly authorized employees and agents of the San Luis Obispo County Sheriff's Office and were acting under color of state law and within the course and scope of their duties, with the complete authority and ratification of their principal, the COUNTY. DOES 4 and 5 are sued in their individual capacities.

37. Defendant CASEY VERT ("VERT") is, and at all times relevant to this Complaint was, a Correctional Sergeant employed by the COUNTY at the San Luis Obispo County Jail. VERT was the on-duty supervising sergeant and shift commander on the day shifts of December 11, 12, and 13, 2025, including at the time of GOSS's suicide attempt. VERT is a duly authorized employee and agent of the San Luis Obispo County Sheriff's Office and was acting under color of state law and within the course and scope of his duties, with the complete authority and ratification of his principal, the COUNTY. VERT was previously sued herein as DOE 6 and/or DOE 7. VERT is sued in his individual capacity.

38. Defendant AMANDA DWYER ("DWYER") is, and at all times

relevant to this Complaint was, a Correctional Sergeant employed by the COUNTY at the San Luis Obispo County Jail. DWYER was an on-duty supervising sergeant and shift commander on the day shifts of December 12 and 13, 2025, including at the time of GOSS's suicide attempt. DWYER is a duly authorized employee and agent of the San Luis Obispo County Sheriff's Office and was acting under color of state law and within the course and scope of her duties, with the complete authority and ratification of her principal, the COUNTY. DWYER was previously sued herein as DOE 6 and/or DOE 7. DWYER is sued in her individual capacity.

39. DOES 8 through 10 are employees of WELLPATH and/or CFMG in San Luis Obispo, and at times relevant to the complaint were employed in the capacity of a correctional nurses and medical staff. Defendant DOES 8-10 are duly authorized employees and agents of the WELLPATH and/or CFMG, and were acting within the course and scope of their perspective duties as jail medical staff in the San Luis Obispo County Jail with the complete authority and ratification of their principal WELLPATH and/or CFMG. Defendants DOES 8-10 are being sued in their individual capacities.

40. Plaintiffs were ignorant of the true names of MOLINA, TORRES, VERT, and DWYER when they filed this action and each prior complaint, and therefore sued them by fictitious names. Plaintiffs were likewise ignorant of the true names of STORMS and BORDEN. The COUNTY first disclosed the identities and roles of MOLINA, TORRES, VERT, and DWYER in its responses to Plaintiff's interrogatories, served October 15, 2026, and first identified STORMS and BORDEN as the custody deputies assigned to West Dorm 800 on December 13, 2025, by letter from counsel on October 22, 2026. Plaintiffs will amend this Complaint to state the true names and capacities of the remaining DOE defendants when ascertained.

41. At all times mentioned herein, each and every defendant was the

agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

## FACTUAL ALLEGATIONS

42. Mr. GOSS had a known prior history of attempted suicide in 2000. GOSS made a second attempt sometime between 2000 and 2002.

43. Mr. GOSS's prior suicide attempts were noted in his jail medical records maintained by the COUNTY in connection with his incarcerations in the San Luis Obispo County jail in February of 2020 and in October 2025.

44. On December 10, 2025, officers of the Arroyo City Police department officers contacted Trisha Roberts to obtain information about GOSS. Ms. Roberts answered the officers' questions and informed officers that GOSS was at risk of committing suicide by sharing text messages that she received from him that indicated he intended to end his own life.

45. On December 11, 2025, at approximately 2:00 a.m., Mr. GOSS was arrested by MOLINA and other deputies of the San Luis Obispo Sheriff's Department for evading, reckless driving and/or related charges.

46. Before the arrest, an Arroyo Grande Police Department officer was told by Trisha Roberts that GOSS was at risk of suicide. That information was relayed to a COUNTY dispatcher, DOE 2, who broadcast it over the radio. MOLINA was aware of this information when he arrested GOSS. At the scene of the arrest, MOLINA, or another Sheriff's deputy or investigator acting with him, asked GOSS whether he was currently suicidal. GOSS said he was not actively suicidal only because he was "in cuffs" and "surrounded by cops." Asked whether he had tried to kill himself while driving, GOSS answered, "no but only because he had a passenger in his vehicle." GOSS was then told "not to say that too loud."

47. MOLINA brought GOSS to the San Luis Obispo County jail.

48. MOLINA did not communicate the radio broadcast of GOSS's suicide risk, the content of GOSS's text messages, or GOSS's statements at the

scene to any custodial or medical staff at the San Luis Obispo County Jail. The jail's intake screening recorded that no transporting or arresting officer had communicated that GOSS may be a suicide risk.

49. On December 11, 2025 at between 3:36 am and 4:46 am, Nurse Neal Chittenden performed an intake screening of GOSS in connection with his admission to the jail. Chittenden noted, among other things, a prior suicide attempt in 2002 by "cutting/stabbing", "daily meth use" "for greater than a year", a "current or past mental health diagnosis" to wit a "Hx suicide attempt", that Mr. GOSS was "currently taking or supposed to be taking medication for emotional / mental health problems", and "prior hospitalization for psychiatric problems."

50. Chittenden's assessment indicated a "positive screen" in the category: "County Brief Jail Mental Health Screen - SLO," thus requiring a further mental health evaluation which was indicated as "urgent (tomorrow)".

51. Chittenden asked Goss whether he was currently suicidal. He responded by stating, "not at this moment but ask me again in two days."

52. In the section "placement/ housing" Chittenden indicated, "other: (per class)."

53. On December 11, 2025, TORRES interviewed GOSS for classification. GOSS remembers being asked about gangs and inmates he would prefer to avoid, but not about suicide or suicidal ideation. GOSS nonetheless disclosed his prior suicide attempts during the classification process, and classification reported to mental health staff that GOSS displayed odd behavior and expressed a history of self-harm.

54. TORRES determined GOSS's housing placement and, according to the COUNTY, had final authority over it. Having interviewed and observed GOSS and received input from mental health staff, TORRES concluded that GOSS's risk of suicide was low and placed him in general population in West Dorm 800, with unmonitored access to the housing unit's second-floor tier.

55. COUNTY policy assigns responsibility for creating a safety plan for inmates who pose any risk of suicide to the qualified mental health professional, in collaboration with the on-duty correctional sergeant. VERT was the on-duty sergeant on the day shift of December 11, 2025, when GOSS was screened, classified, and seen by mental health staff, and VERT and DWYER were the on-duty sergeants on the day shifts of December 12 and 13, 2025. On information and belief, no safety plan was created for GOSS, and neither VERT nor DWYER required one, reviewed his housing, or ordered any monitoring.

56. Mental health staff deferred GOSS's housing to classification, recording "per class" as the housing recommendation, while classification relied on mental health staff's input to conclude that his risk was low. No one with clinical training made, or was required to make, the housing decision for a detainee with known suicide risk factors.

57. On December 11, 2025 at approximately 9:05 am, Francine Tillman (TILLMAN), a mental health professional and DOE 4, a custodial deputy, met GOSS cell-side to complete a brief mental health check-in, following a classification report stated GOSS displayed odd behavior and expressed a history of self-harm. Tillman introduced herself and the purpose of the visit. GOSS described suicide attempts in "2000 and 2002". Tillman asked Goss whether he was currently suicidal. He responded by stating, in substance, "not at this moment but ask me again in two days." Tillman did not ask any follow up questions concerning recent suicidal thoughts, their frequency and severity.

58. According to Tillman, GOSS denied current homicidal and suicidal intent. He stated his ex-girlfriend is a source of support. In an apparent recognition that incarceration itself increases the risk of suicide, Tillman reviewed grounding steps like breathing "in the event he becomes overwhelmed with legal worries." TILLMAN also noted, GOSS "appears to be shocked in the jail environment as he expressed some confusion about behavior that led to his arrest." TILLMAN did

not make any referrals for any follow-up and instead determined that any follow-up treatment should be PRN (*pro re nata*, i.e. as needed) or through sick call. Tillman ended the visit and reported the information to classification.

59. On December 12, 2025, at approximately 10:04 am, Amber Bortello ("BORTELLO") a qualified mental health professional performed a Mental Health Initial Evaluation of GOSS.

60. BORTELLO describes GOSS's mood during the evaluation as "slightly irritated and affect is flat."

61. BORTELLO identified two risk factors including GOSS's gender and two previous suicide attempts. Botello noted GOSS's use of "meth" and unwillingness to substance abuse program but did not weigh either of these facts as a risk factor.

62. Bortello also asked Goss whether he was currently suicidal. He responded by stating, in substance, that he was not currently suicidal but his feelings could change rapidly. Bortello did not ask any follow up questions concerning recent suicidal thoughts, their frequency and severity.

63. According to BORTELLO, GOSS reported a history of depression and treatment through medication, but he could not recall the name of the medication and had apparently discontinued it because he "did not like the way it made him feel." GOSS also complained of anxiety and that he "asks to meet with prescribing provider."

64. BORTELLO obtained the details of GOSS's prior suicide attempts. In 1997 he attempted to end his life "via overdose." Botello then noted, "the second attempt was in 2002 when he cut his wrists." Botello further noted, "after both of these attempts he was placed on a 5150 and subsequently inpatient in SLO."

65. BORTELLO identified protective factors including: future goals and defined plans, "responsibility to family or others; living with family", and

"[s]ocial support (friends)."

66. However, these so-called protective factors were attenuated by GOSS's incarceration because he would (by definition) be physically separated from his friends and family on whom he relied for support.

67. In spite of these facts, BORTELLO indicated GOSS's "current self-harm/ suicide risk level" as low.

68. BORTELLO nevertheless called for a consultation with a Psychiatric-Mental Health Nurse Practitioner to refer GOSS for a Specialized Nursing Intensive Assessment (SNIA) if he meets diagnostic criteria.

69. Critically, in the section housing recommendation section Botello selected "Other (specify): (per class)" indicating that GOSS's housing would be determined by classification and not by her assessment.

70. BORTELLO also selected NA in the section for "other recommendation:" thus missing an opportunity to at minimum alert custodial deputies and medical staff that GOSS required frequent or continuous monitoring to manage the serious and known risk that he could attempt suicide.

71. On December 12, 2025 at approximately 1:11 pm, Plaintiff was brough out of the housing unit to speak to KELLER after GOSS informed staff that we would like to talk with the therapist about his concerns regarding court. Reportedly, GOSS was otherwise answering when talking about his concerns. GOSS expressed he "has a lot of things going on." KELLER noted that GOSS spoke in a monotoned manner, had avoidant eye contact, and shifted weight frequently. Keller also asked Goss whether he was currently suicidal. He responded by stating, in substance, "not at this moment but ask me again in the near future." Any reasonable mental health professional would have appreciated that this answer was not the same a denial of suicidal ideation. Keller did not ask any follow up questions concerning *recent* suicidal thoughts, their frequency and severity. Given that GOSS had qualified his denial of current suicidal ideation

with an explicit warning that his feelings could change quickly, his monotoned manner, avoidant eye contact, and his inability to sit still by shifting his weight frequently, a reasonable mental health professional would have assessed GOSS as 'potentially' suicidal even though GOSS reportedly denied current suicidal ideation. There is no evidence in Keller's exam notes of any follow up questions to assess GOSS's *recent* suicidal thoughts and behaviors. Keller then educated GOSS on how to contact mental health in case of an emergency and to notify the officers or to press the emergency intercom in the housing unit. KELLER made a follow up appointment next week but took no other action.

72. NCCHC standards and guidelines distinguish between inmates who are 1) acutely suicidal, 2) those who are non-acutely or potentially suicidal, and 3) those for whom no suicide precautions are indicated. GOSS's repeated statements that he was not currently feeling suicidal but could feel suicidal in matter of days did not reasonably establish that no precautions were indicated. At a minimum, his statements, independent of the facts surrounding his arrest, indicated that he was potentially suicidal and called for further inquiry into his recent suicidal ideation and behavior. Under the NCCHC guidelines, specific suicide precautions are required for a potentially suicidal inmate, including but not limited to safety checks at intervals of no more than 15 minutes.

73. Moreover, the guidelines distinguish between screenings which are "generally a one-time event used at intake for the early identification of individuals at potentially high risk for suicide," through the use of yes/no questions and assessments which are "not a one-time event, but a process that should be ongoing throughout the at-risk patient's incarceration." An assessment is "an in-depth process involving a comprehensive examination conducted by a qualified mental health professional," by a "thorough evaluation of the individual's history and functioning across multiple domains, providing a more complete clinical picture." The guidelines state that an assessment must "Gather

*complete information about past, recent, and present suicidal ideation* and behavior." (emphasis added). The guidelines also warn, "It is extremely important for a qualified health care professional (QHCP) to balance patient self-report with the collection of objective data related to the patient's suicide risk using all information available to them. Whenever possible, previous treatment information should be reviewed, along with objective data from staff observations and incident reports, and direct observation of the patient during the clinical interview." There is no evidence that Bortello, Tillman, and/or Keller asked any questions about GOSS's *recent* suicidal ideation and/or behavior, nor is there any evidence that reviewed or sought out staff observations of GOSS's behavior.

74. Upon information and belief, CFMG / WELLPATH uses the Columbia Suicide Assessment questionnaire for its jail suicide assessments. This assessment tool includes questions on topics including but not limited to: Wish to Be Dead; Non-Specific Active Suicidal Thoughts; Active Suicidal Ideation with Method, Without Plan or Intent; Active Suicidal Ideation with Intent, Without Specific Plan; Active Suicidal Ideation with Specific Plan and Intent. There is no evidence that these categories of questions and the corresponding sub-questions were asked to GOSS.

75. Additionally, between December 11, 2025 and December 13, 2025 inmate Jaylen Martin repeatedly raised concerns to correctional deputies that GOSS was suicidal. In fact, he warned a deputy, of Hawaiian ethnicity, to check on GOSS as he was concerned that he was psychologically decompensating.

76. In addition, Plaintiff, at different times during his incarceration, had walked from his cell to the second-floor tier, approached the edge, hesitated, and returned to his cell without jumping. In one instance, he shouted an expletive out loud, verbally he berated himself for not jumping, and stated, "you just got to do this." These episodes were observable to custody staff, were likely reported by other inmates, and should have been detected through routine surveillance and

monitoring, particularly in light of the other known suicide risk factors described above.

77. On December 13, 2025, at approximately 3:35 pm, Plaintiff attempted suicide by jumping from the second story of the housing tier.

78. The reports of Defendants' medical staff prepared immediately after the incident, including a W&I 5150 application, described Plaintiff's actions as an attempted suicide reflecting a collective and immediate understanding of the nature of the event.

79. Plaintiff survived this attempt but suffered serious injuries that will result in lifelong pain and disabilities.

80. Plaintiff's diagnosed injuries resulting from his fall include but are not limited to severe intracranial bleed with subarachnoid hemorrhage, intraparenchymal hematoma, a Skull fracture, Facial fractures including left zygoma, left medial and lateral orbit fractures and right zygoma fracture, Left 2-10 and right 1 through 5 rib fractures, Left hemopneumothorax, a complex Left clavicle fracture, and a Left scapula fracture. Among other things, his injuries required a left chest tube placement, right frontoparietal ventriculostomy and IC placement, MT on presentation, and management of encephalopathy and acute agitation.

81. While a full long-term prognosis is currently premature, GOSS suffers from severe physical and some cognitive limitations including but not limited to a traumatic brain injury. He has lost his sense of smell and is blind in one eye. He suffers from significant memory issues.

82. He is unable to use his left arm, and he is confined to a wheelchair. He is unable to dress himself, including putting on his pants, shoes, and socks. He cannot shower independently and requires continual assistance which BRANQUINO provides him with. He is also unable to use the bathroom by himself. He is unable to do the landscaping work he previously did.

83. GOSS needs assistance with virtually all aspects of his daily activities.

84. Additionally, both Chittenden and BORTELLO's assessments of GOSS indicated, "Other (specify): (per class)" in the section "Placement/ Housing Recommendation".

85. Upon information and belief, these notes indicate that as a matter of County policy the ultimate question of where to house GOSS (and similarly situated potentially suicidal inmates) was delegated to classification or at least that the final authority for such a decision was highly ambiguous. This creates a structural delegation problem where medical staff with clinical training lack authority or influence over housing decisions, and thus default to minimal assessments and defer to classification officers who lack clinical training.

86. Classification deputies may have also believed that it is the sole responsibility of medical/mental health staff to determine whether an inmate like GOSS should be housed in a medical observation unit and/or at minimum recommend additional monitoring.

87. As such there is a custom and practice of ambiguity and/or a lack of a clear policy defining who has the ultimate authority to decide the housing of individuals with a heightened risk of suicide.

88. This custom and practice and/or policy of inaction was the moving force behind plaintiff's injuries.

89. The COUNTY was on notice that this and other policies regarding reducing the risk of inmate suicide were constitutionally deficient. (See ¶ 123 through ¶ 130 of this Complaint)

90. GOSS, while in the San Luis Obispo County Jail, had merely been charged with a crime and had not been convicted of anything.

91. Accordingly, GOSS was a pre-trial detainee and thus guaranteed rights pursuant to the due process clause of the Fourteenth Amendment, to

objectively reasonable medical care, under Gordon v. County of Orange, 888 F. 3d 1118, 1124-25 (9th Cir. April 2018) & 6 F. 4th 961 (9th Cir. July 2021) *(Gordon I and II)*. A pretrial detainee has a further right to receive medical care from Defendants which includes the right to psychiatric treatment. (*Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Circ. 2002). "Just as a prisoner may starve if not fed, he or she suffers or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society. "*Brown v. Plata*, 563 U.S. 493, 131 S. Ct 1910, 1928 (2011).

92. At all relevant times to the complaint, GOSS was and was known to be a potentially suicidal inmate. According to NCCHC (National Commission on Correctional HealthCare), a nationwide governing body which sets standards in correctional healthcare and which counties rely upon in creating jail mental health and medical standards and policies, suicide is the leading cause of death in correctional facilities nationwide. An acutely suicidal inmate should be placed on *constant observation* and not left unmonitored and *a non-acutely suicidal inmate (potential or inactive) who expresses current suicidal ideations* (eg: a wish to die without a specific threat or plan) *and/or has recent prior history of self-destructive behavior* should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes. Jail areas where suicidal inmates are monitored should be as suicide resistant as possible.

93. Further many inmates with mental illness have co-occurring substance use disorders.

94. At all material times, and alternatively, the actions and omissions of each Defendants were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to GOSS' and Branquinho's Rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

95. As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims, Plaintiff sustained the following injuries and damages, past and future, among others:

a. Past and future Pain and suffering

b. Past and future medical care

c. Past and future loss of enjoyment of life

d. All damages and penalties recoverable under 42 U.S.C. 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

## FIRST CLAIM FOR RELIEF

**Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983-14th Amendment of the U.S. Constitution, (Against Defendants TILLMAN, BORTELLO, KELLER, MOLINA, TORRES, STORMS, BORDEN, and DOES 2, 4-5, and 8-10)**

96. Plaintiff repeats and re-alleges each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

97. From the time GOSS was booked into the San Luis Obispo County Jail until his suicide attempt on December 13, 2025, the Defendants repeatedly denied him proper medical care in repeated violation of his 14th Amendment constitutional rights.

98. The Arroyo Gande Police Department officer that spoke to Trisha Roberts and learned that GOSS was suicidal as described above and reported that information to the County dispatcher, DOE 2. MOLINA, the SLO County Deputy who arrested GOSS, knew that GOSS had expressed suicidal intent, was at substantial risk for suffering serious harm. Nevertheless MOLINA and DOE 2 made intentional decisions not to communicate to San Luis Obispo Jail custodial

deputies and/or jail medical staff that GOSS had expressed suicidal intent at or near the time of his arrest even though that information was critically important to assessing GOSS's suicide risk and determining appropriate preventative measures. In failing to communicate this information MOLINA and DOE 2 each failed to take reasonable measures to abate the risk.

99. Nevertheless, nurse Neal Chittenden performed an initial medical evaluation of GOSS and determined that GOSS was at risk for committing suicide and in need of an urgent mental health evaluation. Among other things Chittenden noted prior suicide attempts, prior hospitalizations for mental health, and medication for mental health problems, and put subsequent jail medical staff, mental health care providers, and custodial deputies on notice that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide. When asked about current suicidal ideation, GOSS told Chittenden in substance that he was not currently feeling suicidal but that his feelings could change within days.

100. Defendant TILLMAN, a qualified mental health professional then performed a mental health evaluation of GOSS after classification reported that he displayed odd behavior and expressed a history of self-harm. In addition to the risk factors highlighted by Chittenden's earlier examination, GOSS apparently expressed feeling overwhelmed with legal worries and confusion about the behavior that led to his arrest. These facts further put TILLMAN and other defendants on notice that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide. TILLMAN failed to take reasonable measures to abate this risk by not making any referrals for follow-up and/or any recommendations regarding housing and/or monitoring. Most critically, Tillman also asked GOSS about current suicidal ideation and again GOSS responded that while he was not currently suicidal he could feel that way in a few days. Even independently of the facts surrounding his arrest, GOSS's

answer should have qualified him as a potentially suicidal inmate and triggered suicide prevention precautions, such as 15 minute safety checks. In contravention of NCCHC guidelines, Tillman did not ask any questions about recent suicidal ideation or behaviors.

101. Defendant BORTELLO's next mental health professional to evaluate GOSS. BORTELLO's examination revealed further details about GOSS's past suicide attempts and treatment pursuant to 5150.

102. BORTELLO made intentional decisions to under-weigh obvious suicide-risk indicators (including but not limited to prior suicide attempts, methamphetamine use and future withdrawals, the psychological stress of being incarcerated and facing criminal charges, etc.,) and over-rely on purported protective factors, including a qualified equivocal denial of current suicidal ideation without any follow up questions and/or other due dilligence about recent suicidal ideation and behavor, and other factors that were not protective under the circumstances (the support of family members and friends despite the separation from that support) as, resulting in an objectively unreasonable mis-categorization of GOSS as presenting no suicide risk instead of as a potentially suicidal inmate.

103. BORTELLO was nevertheless aware that GOSS was at substantial risk of suffering serious harm by committing or attempting to commit suicide.

104. BORTELLO failed to take reasonable measures to abate this risk by failing to make any recommendation regarding GOSS's housing in the jail or the frequency level of monitoring needed to meaningfully abate the risk.

105. KELLER, also, building on prior assessments, evaluated Mr. Goss after he told staff he wanted to speak to a therapist about his concerns regarding court. GOSS displayed behavior and mannerisms associated with individuals that are potentially suicidal. These observations and combined with the prior assessments, and GOSS's equivocal and qualified denial of current suicidal ideation, put defendants on further notice that GOSS was at substantial risk of

committing or attempting to commit suicide. At minimum, Keller should have asked additional questions and performed due diligence regarding GOSS's recent suicidal thoughts and behaviors. However there is no evidence in Keller's examination note of any about recent suicidal thoughts and/or behaviors. Keller thus, failed to take reasonable measures to abate this risk by failing to make any recommendations regarding housing and/or monitoring. Instead, KELLER educated GOSS to contact mental health in case of an emergency.

106. In effect all three mental health professionals treated GOSS as an inmate posing no risk under the NCCHC guidelines.

107. STORMS and BORDEN were the custody deputies assigned to GOSS's housing unit, West Dorm 800, on December 13, 2025. Under COUNTY policy, including Section 510.9 of the San Luis Obispo County Sheriff's Office Custody Manual, the deputies assigned to a housing unit are responsible for conducting safety checks of, and observing, the inmates housed there. Upon information and belief, STORMS, BORDEN, and DOES 4 and 5 observed statements and behaviors from GOSS that indicated his suicidal intent, and observed or should have observed GOSS actively contemplating suicide by repeatedly walking from his cell to the edge of the second-floor tier, staring down, and walking away in psychological distress. Upon information and belief, STORMS, BORDEN, and DOES 4 and 5 failed to conduct adequate safety checks, failed to monitor GOSS, and made intentional decisions to ignore these signs and failed to abate the risk by failing to report them to their supervisors or to jail medical and mental health staff.

108. Upon information and belief, COUNTY custodial deputies, DOES 4 and 5, also received warnings about GOSS's risk of suicide from other inmates, including Jaylen Martin. DOES 4 and 5 made intentional decisions to ignore these warnings and failed to abate the risk by failing to report the same to their supervisors or to jail medical and mental health staff.

109. TORRES, knowing of GOSS's prior suicide attempts, his disclosure of a history of self-harm, his odd behavior, and the positive mental health screen, made an intentional decision to house GOSS in general population with access to the second-floor tier and without any monitoring. That decision put GOSS at substantial risk of suffering serious harm, and TORRES did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved.

110. It was objectively unreasonable for these Defendants to ignore the numerous objective signs and symptoms of GOSS's deteriorating condition particularly between GOSS's arrest, his various mental health evaluations, and requests for help. Any diligent custodial deputy, registered nurse, medical doctor, and/or other mental health professional would have been apprised of the serious impending medical condition, and promptly actively monitored GOSS who were both withdrawing from methamphetamine and potentially suicidal. If was further objectively unreasonable to Defendants to house GOSS in a minimal observation housing unit because all defendants knew that the jail was unequipped to provide the level of care, monitoring and treatment that GOSS required in light of his suicidality.

111. Each and all Defendants made numerous intentional decisions regarding the conditions of GOSS's confinement: they failed to conduct adequate suicide risk assessments; they deferred to classification for housing decisions without making any recommendations, they failed to provide reasonable treatment for GOSS's opiate withdrawals and active psychological distress; they failed to actively monitor GOSS to monitor his actions as he slowly climbed onto a second floor tier railing and jumped over, and sustained grave injuries; they failed to continuously assess GOSS as an active suicide risk; they failed to follow the County's own jail suicide watch policies for classification and monitoring pretrial

detainees; and they failed to refer him to a higher level of care knowing they were not qualified as mental health treatment unit to address GOSS' active crisis.

112. As a result of the repeated denial of proper medical and psychiatric care, GOSS spent his time at the San Luis Obispo County Jail suffering unnecessary psychological turmoil before attempting to take his own life and suffering devastating injuries.

113. The Defendants acted with deliberate indifference to GOSS's serious medical conditions and needs by failing to provide proper medical attention, failing to actively monitor him, and by failing to administer any legitimate suicide assessment evaluations, all while observing and documenting his deteriorating psychological condition.

114. GOSS was deemed to be a pretrial detainee, and such, the Defendants by their act of deliberate indifference in failing to provide medical care to treat GOSS's serious medical condition, the conduct thereof constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

115. All Defendants were deliberately indifferent to the serious medical needs of plaintiff GOSS. It should be adequately clear that a reasonable medical practitioner would comprehend that by denying medical care, GOSS was exposed to undue suffering and the risk of death and grave injury. The Defendant jail officials and WELLPATH individual defendants including DOES 2, 4-5, and 8-10, intentionally denied GOSS proper medical care by failing to treat, to monitor, to refer to a doctor, or to transfer him for proper care, causing him to unduly suffer for approximately 2 days before he attempted to commit suicide.

116. Had the Defendants and their employees, agents, and servants, not acted with deliberate indifference to the obvious and serious health needs of GOSS, and provided prompt medical attention, he would not have sustained his injuries.

117. GOSS's injuries were easily avoidable.

118. The aforementioned acts and omissions of the Defendants violated GOSS's constitutional rights guaranteed under 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the United States Constitution. The defendants knew that failing to treat GOSS's worsening medical problems could lead to grave injury and/or a fatality.

119. Accordingly, Defendants each are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983 and to reasonable attorney fees under sect. 1988.

120. GOSS' Compensatory damages include the reasonable value of the nursing and household services provided by CRYSTAL BRANQUINHO. His diminished earnings capacity; and expenses associated with obtaining substitute domestic, household, and caregiving services.

## SECOND CLAIM FOR RELIEF

## MONELL: UNCONSTITUTIONAL POLICIES AND CUSTOMS

## (Against Defendants COUNTY)

121. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

122. At all relevant times, the COUNTY maintained unconstitutional policies, customs, and practices governing suicide-prevention, mental-health assessment, and housing of detainees with known suicide risk.

123. The COUNTY maintained a policy and custom of delegating suicide-risk housing decisions to classification deputies, rather than to trained mental-health professionals. Intake Nurse Chittenden and QMHP BORTELLO both documented "Other (per class)" in the housing recommendation section, reflecting a policy that classification rather than clinical staff actually determined housing for suicidal detainees.

124. This delegation created a structural ambiguity in which mental health staff lacked authority to place suicidal detainees in suicide-resistant housing or observation units, and classification deputies lacked the clinical training to make such determinations. As a result, Plaintiff and similarly situated detainees with known suicide risk were routinely housed in unsafe units with inadequate monitoring.

125. The COUNTY maintained a policy and custom of relying solely on detainee self-reporting to determine suicide risk, even when objective indicators demonstrated a substantial risk of self-harm. Despite Plaintiff's two prior suicide attempts, daily methamphetamine use, psychiatric history, positive mental-health screen, flat effect, monotone speech, avoidant eye contact, and repeated warnings from inmate Jaylen Martin, COUNTY staff effectively ignored objective risk factors because Plaintiff purportedly denied current suicidal ideation.

126. The COUNTY maintained a policy and custom of failing to conduct adequate suicide-risk assessments. QMHPs TILLMAN, BORTELLO, and KELLER each minimized Plaintiff's risk by under weighing clear risk factors and overweighing protective factors that were at best severely attenuated since Plaintiff was in custody. None recommended suicide-resistant housing, enhanced monitoring, or timely follow-up.

127. The COUNTY maintained a policy and custom of failing to provide structured monitoring for detainees with known suicide risk. Despite multiple risk indicators and a positive mental-health screen requiring urgent evaluation, Plaintiff received no enhanced observation, no safety checks, and no placement in a suicide-resistant cell.

128. The COUNTY maintained a policy and custom of failing to ensure communication of suicide-risk information between arresting officers, intake, classification, custody, and mental-health staff. Even if facts were communicated,

each evaluator considered their observations during their evaluations in isolation rather than cumulatively.

129. The COUNTY maintained a policy and custom of failing to place detainees with known suicide risk in suicide-resistant housing, instead housing them in general-population units with access to elevated tiers.

130. The COUNTY's written policies governing suicide prevention, safety checks, mental health services, classification, and reception and pre-booking screening (San Luis Obispo County Sheriff's Office Custody Manual §§ 504, 504.3, 510.9, 515, 515.4, 535, 722, and 743) permitted a classification deputy without clinical training to make the final housing decision for a detainee with a history of suicide attempts and a positive mental health screen, without requiring that mental health staff make or concur in that decision.

131. These policies and customs were the moving force behind Plaintiff's injuries. Plaintiff was placed in a general-population unit, received no monitoring, and was able to access a second-story tier from which he attempted suicide.

**THE COUNTY WAS ON NOTICE OF CONSTITUTIONALLY DEFICIENT POLICIES REGARDING SUICIDAL INMATES**

132. Before Plaintiff's injuries, a series of suicides and suicide attempts in 2018 triggered a federal DOJ investigation pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997, and the DOJ's resulting findings and settlement placed the County on repeated notice that its suicide-prevention, housing, monitoring, and review systems were systemically deficient.

133. In August 2018, two detainees attempted suicide on the same day; deputies intervened.

134. On September 1, 2018, Michael Nonella died by suicide after a sequence of failures later documented by the DOJ: a missed court-ordered mental-health evaluation, presentation as "extremely depressed and suicidal,"

brief placement in a suicide-resistant cell, discharge from that cell without an in-person psychiatric evaluation, and transfer to an isolation cell without suicide precautions.

135. These events, occurring within weeks of each other, triggered a federal CRIPA investigation into the County's mental-health care, suicide-prevention practices, and housing/classification systems

136. In August 2021, the DOJ issued formal findings concluding there was reasonable cause to believe the County violated the Constitution through systemic failures in suicide prevention, mental-health care, restrictive housing, and incident review.

137. In January 2025, the County entered into a DOJ Settlement Agreement requiring extensive suicide-prevention reforms, confirming that the deficiencies identified in the 2018–2021 period were systemic, longstanding, and known to County policymakers.

138. The DOJ required the COUNTY to implement joint custody mental health housing decisions, adhere to QMHP recommendations, provide constant observation for suicidal detainees, conduct structured follow-up, and eliminate reliance on video monitoring, requirements that directly correspond to the failures in Plaintiff's claims.

139. The COUNTY's unconstitutional policies and customs caused Plaintiff's injuries.

## <u>THIRD CLAIM FOR RELIEF</u>

## MONELL: FAILURE TO TRAIN AND SUPERVISE

## (Against COUNTY)

140. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

141. The COUNTY failed to train and supervise correctional and mental-health staff on suicide-risk assessment, suicide-prevention protocols, and the management of detainees with methamphetamine-related psychiatric symptoms.

142. COUNTY staff were not trained to recognize or act upon objective suicide indicators, including prior attempts, psychiatric history, methamphetamine use, flat affect, monotone speech, avoidant eye contact, agitation, and inmate warnings.

143. COUNTY staff were not trained to conduct adequate suicide-risk assessments. QMHPs under-weighed risk factors, over-credited attenuated protective factors, and failed to recommend suicide-resistant housing or enhanced monitoring.

144. More specifically, the COUNTY failed to train their employees and mental health professionals in properly performing mental health assessments, in over relying on denials of current suicidal ideation, and in failing to ask appropriate follow up questions regarding recent suicidal thoughts and behaviors.

145. COUNTY staff were not trained to understand that protective factors such as family support are attenuated or unavailable during incarceration and therefore cannot be relied upon to reduce suicide risk.

146. COUNTY staff were not trained to recognize the heightened suicide risk associated with methamphetamine intoxication and withdrawal, including impulsivity, depression, agitation, and denial of suicidal ideation.

147. COUNTY staff were not trained to communicate suicide-risk information across intake, classification, custody, and mental-health units. As a result, critical information documented by intake nurse Chittenden and classification deputies was not acted upon.

148. COUNTY staff were not trained to follow up on positive mental-health screens requiring urgent evaluation, nor to initiate suicide precautions pending evaluation.

149. COUNTY staff were not trained to place detainees with known suicide risk in suicide-resistant housing or to initiate constant observation.

150. The COUNTY's training for custody staff consists of a custody academy, approximately twelve weeks of on-the-job training, Crisis Intervention Training, firearms and arrest-and-control training, the CORE Correctional Officer Academy, CPR and first aid, and Prison Rape Elimination Act training. The COUNTY has identified no training for custody or classification staff in identifying suicide risk in detainees who deny current suicidal ideation, in suicide-risk housing decisions, or in communicating suicide-risk information among arresting officers, dispatch, intake, classification, and mental health staff.

151. The 2025 DOJ Settlement Agreement confirms that the COUNTY's suicide-prevention training was constitutionally deficient. The DOJ required the COUNTY to implement comprehensive training on suicide-risk assessment, monitoring, housing decisions, and communication—training that was absent in Plaintiff's case.

152. The COUNTY's failure to train and supervise its employees was the moving force behind Plaintiff's injuries.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**MONELL: RATIFICATION**

**(Against COUNTY)**

153. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

154. COUNTY, policymakers had actual notice of systemic deficiencies in suicide prevention practices through multiple sources, including the 2018 suicide

cluster, the CRIPA investigation, the 2021 DOJ Findings Letter, and the 2025 DOJ Settlement Agreement.

155. The 2021 DOJ Findings Letter identified constitutionally deficient suicide-prevention practices, including inadequate monitoring, inadequate housing decisions, inadequate communication, and inadequate mental-health evaluations that were also a moving force in producing Plaintiff's injuries.

156. The 2025 DOJ Settlement Agreement required the COUNTY to implement specific suicide-prevention reforms, including joint custody mental health housing decisions, adherence to QMHP recommendations, constant observation for suicidal detainees, structured follow-up, and suicide-resistant housing.

157. Despite this notice, COUNTY policymakers failed to correct the unconstitutional policies and customs described above.

158. COUNTY policymakers ratified the conduct of the employees involved by failing to discipline, retrain, or correct the systemic deficiencies that caused Plaintiff's injuries.

159. Following GOSS's suicide attempt, the COUNTY made no change to any of its policies on suicide watch, mental health observation housing, suicide prevention, classification, or the reporting of suicide risk from arresting officers to dispatch, jail medical staff, and custody staff. The COUNTY has thereby approved the decisions of MOLINA, TORRES, VERT, and DWYER and the basis for them.

160. COUNTY policymakers acted with deliberate indifference to the known risk that detainees—including Plaintiff—would suffer serious harm or death as a result of these deficiencies.

161. The COUNTY's ratification and deliberate indifference were the moving force behind Plaintiff's injuries.

## FIFTH CLAIM FOR RELIEF

**Supervisory Liability per 42 U.S.C. § 1983**

**(Against Defendants VERT and DWYER)**

162. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

163. At all times relevant to this Complaint, VERT and DWYER were acting under color of state law as San Luis Obispo County Jail Sergeants, shift commander(s), shift supervisors, and as the ranking supervisor(s) to defendant deputies and custody staff.

164. Between December 11 and December 13, 2025, VERT and DWYER, as the on-duty supervising sergeants, were aware or should have been aware that GOSS had a history of prior suicide attempts, had disclosed a history of self-harm to classification, had screened positive on his intake mental health screen, displayed other objective signs of suicide risk, and had not been given any medication or allowed to see a provider despite his requests. Despite this notice, VERT and DWYER permitted TORRES's placement of GOSS in general population with access to the second-floor tier and without any additional monitoring, required no suicide safety plan, and did not review his housing. As shift supervisors, VERT and DWYER were also responsible for maintaining a system in which at-risk individuals are placed in suicide-resistant housing.

165. VERT and DWYER failed to ensure collaboration between jail nurses, QMHP's, classification, and other custodial deputies.

166. On December 13, 2025, VERT and DWYER, who were acting as shift commanders and supervisor in charge of deputy and custody staff at GOSS's housing unit, were responsible for inmates' welfare and safety and to ensure all inmates and particularly inmates at risk of suicide were being observed and monitored. VERT and DWYER failed to order a careful watch and monitoring of GOSS in the tier and failed to ensure that GOSS who had recently and repeatedly

expressly an intent to commit suicide was called in lower trier removing the threat of a 2nd story height would pose.

167. Defendants VERT and DWYER's conduct was so closely related to the deprivation of GOSS's right to be the moving force that caused the constitutional violation, and Plaintiff's injuries.

168. As a direct and legal result of Defendants' acts, Plaintiff suffered damages, including, without limitation, past and future pain and suffering, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## SIXTH CLAIM FOR RELIEF

## NEGLIGENCE

**(On behalf of Plaintiff and Asserted against, CFMG, TILLMAN, BORTELLO, KELLER, MOLINA, TORRES, VERT, DWYER, STORMS, BORDEN, and DOES 2, 4-5, and 8-10)**

169. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

170. Defendants, and each of them, have a duty to operate and manage the San Luis Obispo County Jail in a manner to prevent the acts and/or omissions alleged herein. Said defendants owed GOSS, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

171. Defendants MOLINA, DOE 2, and TORRES each had a duty of care to take reasonable steps to ensure GOSS's safety by insuring critically important information, to wit, GOSS's active suicidal intent was communicated to custodial and/or medical staff at the San Luis Obispo County Jail. Each of these defendants breached this duty and failed to communicate this information.

172. Defendants STORMS, BORDEN, DOES 4 and 5, VERT, and DWYER were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail deputies and supervisors to GOSS. It was foreseeable that as a result of Defendants' acts and omissions, as described above, GOSS' symptoms of suicidality and his co-morbid methamphetamine withdrawal would worsen, resulting in his physical injury, suffering, and attempted suicide. Defendants' breach proximately caused injuries and damage to GOSS as Plaintiff claim herein.

173. DOES 8-10 were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail medical staff by failing to monitor, report, and respond to GOSS's distressed behavior and other objective signs that he was at risk of suicide.

174. Defendants TILLMAN, BORTELLO, and KELLER were each negligent in that each's individual conduct fell below the standard of care for a reasonable qualified mental health professional when discharging their duties jail mental health staff.

175. Defendants TILLMAN, BORTELLO, and KELLER each owed plaintiff a duty of to exercise the level of skill, knowledge, and care ordinarily possessed and exercised by reasonably prudent mental health professionals under similar circumstances, including the duty to conduct adequate suicide-risk assessments, properly weigh known risk factors, act on objective indicators of psychiatric distress, communicate risk information, and recommend appropriate monitoring, housing, and follow-up care.

176. TILLMAN, BORTELLO, and KELLER each breached their duties of care by failing to conduct adequate suicide-risk assessments, failing to properly weigh Plaintiff's known risk factors particularly his prior history of suicide attempts and recent statements of suicidal intent, over-crediting protective factors that were unavailable in custody, failing to act on Plaintiff's

methamphetamine-related risk factors, failing to act on repeated warnings from another inmate, incorrectly assessing Plaintiff as at low risk for suicide, failing to provide anti-depression and anti-psychotic medication, failing to refer to a provider or psychiatrist in light of GOSS's own request, failing to recommend suicide-resistant housing or enhanced monitoring, and failing to recommend timely follow-up or emergency intervention.

177. As a direct and proximate result of the defendants' aforementioned conduct and breaches of the various duties owed to GOSS, Plaintiffs suffered damages. The defendants are liable to GOSS for damages including but not limited to past and future medical expenses, past and future pain and suffering and loss of enjoyment of life.

178. GOSS' Compensatory damages include the reasonable value of the nursing and household services provided by CRYSTAL BRANQUINHO.

179. Plaintiffs also assert punitive damages against named COUNTY defendants for conduct that amounts to recklessness, maliciousness and oppressiveness.

## <u>SEVENTH CLAIM FOR RELIEF</u>

## BANE ACT C.C. 52.1 Et Seq. (State)

## (On behalf of Plaintiff and Asserted against COUNTY, MOLINA, TORRES, VERT, DWYER, STORMS, BORDEN, DOE 2, and DOES 4-5)

180. Plaintiff hereby repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein. California Civil Code, Section 52.1 (the Bane Act), prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional rights. However, under *Reese v. Cnty of Sacramento*, 888 F.3d 1030, 1042-4043 (9th Cir. 2018), the Bane Act does not require the "threat, intimidation or

coercion' element of the claim to be transactionally independent from the constitutional violation Alleged.

181. Specific intent does not require a showing that a defendant knew he was acting unlawfully; reckless disregard of the right at issue is all that is necessary. [1]*Luttrell v. Hart*, 2020 WL 5642613.

182. On information and belief, Defendants while working for the COUNTY and acting within the course and scope of their duties, denied GOSS necessary healthcare that could have prevented his injuries. All defendants were deliberately indifferent toward GOSS when they chose to ignore his critical suicidal condition.

183. Defendants' actions placed GOSS in an understaffed county facility that was not equipped to provide the necessary suicide prevention treatment.

184. At the understaffed county facility, GOSS was placed in general population with no additional monitoring.

185. With no medical justification, TORRES ordered GOSS placed in general population, and VERT and DWYER, the day-shift supervisors, permitted that placement without any additional monitoring.

186. Neither VERT, DWYER, nor any other Defendant ensured that housing and suicide prevention measures were decided in collaboration between classification and jail mental health staff. As a result, GOSS, a suicidal inmate was placed in general population with access to the second floor of the tier.

187. When Defendants committed the above acts, they acted with the specific intent required under the Bane Act. Defendants intentionally and

---

[1] Per *Luttrell*, if a Plaintiff adequately pleads a claim for deliberate indifference which requires a pleading of reckless disregard, then he was sufficiently alleged the "intent" element required for the Bane Act. Under *Reese*, "a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of that right. Some courts such as *Polance v. California 2022 WL 1539784, at*4 (N.D. Cal. May 16, 2022)* have deemed the application of the Bane Act appropriate when there is a showing of deliberate indifference toward correctional inmates ("observing that "defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as the custody context makes that violation especially coercive" and collecting

spitefully committed the above acts to deny GOSS the necessary healthcare that could have prevented his catastrophic injuries.

188. GOSS reasonably believed and understood that he was being denied the right to adequate healthcare.

189. Defendants successfully interfered with GOSS's civil rights.

190. The conduct of Defendants was a substantial factor in causing Plaintiff's harm, losses, injuries, and damages.

191. Defendant COUNTY is vicariously liable for its employees under California law and the doctrine of respondeat superior.

192. Defendants DOES 2, 4-5, and 8-10 while working for COUNTY, WELLPATH, and/or CFMG and acting within the course and scope of their duties, denied GOSS necessary healthcare and custodial safety that to degree of reasonable certainty, would have prevented his injuries.

193. When Defendants committed the above acts, they interfered with GOSS's civil rights to due process, to equal protection of the laws, to constitutionally adequate medical care, to be free from state actions that shock the conscience, and to life, liberty, and property.

194. Defendants intentionally and spitefully committed the above acts to deny GOSS the necessary healthcare that would have prevented his injuries.

195. GOSS reasonably believed and understood that he was being denied the right to constitutionally adequate healthcare.

196. Defendants successfully interfered with GOSS's civil rights.

197. The conduct of Defendants was a substantial factor in causing Plaintiff' harms, losses, injuries, and damages.

198. Plaintiff brings this claim for compensatory damages and also seeks punitive damages and attorneys' fees under this claim.

## EIGHTH CLAIM FOR RELIEF

**Failure to Summon Medical Care Per G.C. §845.6 AND §844.6**

**(Asserted against COUNTY, TORRES, VERT, DWYER, STORMS, BORDEN, and DOES 4-5)**

199. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

200. California Government Code § 845.6 creates an affirmative duty for jail staff "to furnish or obtain medical care for a prisoner in his custody." GOSS desperately required prompt medical attention from Defendants, San Luis Obispo County Jail staff. Defendants had actual knowledge of GOSS's need for immediate medical care and deliberately chose to not furnish him with medical care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6. As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, GOSS suffered deteriorating mental health, severe methamphetamine withdrawal resulting in his attempted suicide and devastating injuries.

201. Additionally, Defendants failed to perform their mandatory duty under California Government Code § 845.6 to provide medical care to GOSS even though Defendants had actual knowledge that he needed urgent medical care for his serious medical conditions comprising of her severe methamphetamine withdrawal deteriorating mental and physical health and associated symptoms, and suicidal ideation.

202. Defendants are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of *respondeat superior*.

**NINTH CLAIM FOR RELIEF**

**LOSS OF CONSORTIUM**

**(On behalf of Plaintiff BRANQUINHO and asserted against, CFMG, TILLMAN, BORTELLO, KELLER and DOES 8-10)**

203. Plaintiff repeats, re-states, and incorporates each and every allegation in all preceding paragraphs of this Complaint with the same force and effect as if fully set forth herein.

204. CRYSTAL BRANQUINHO has been harmed by the tortious injuries to her spouse JUSTIN GOSS as described above and as a result has suffered and is reasonably certain to suffer in the future the loss of her spouse's love, companionship, comfort, care, assistance, protection, and marital relations.

205. CRYSTAL BRANQUINHO and JUSTIN GOSS had a valid and lawful marriage at the time he sustained the tortious injuries described above and her losses were directly, foreseeably, and proximately caused by the defendants' actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in their favor and against all Defendants, and DOES 2, 4, 5, and 8 through 10, inclusive, as follows:

1. For compensatory damages according to proof, including compensatory damages for past and future medical care, past and future pain and suffering, and loss of enjoyment of life under state common law and under the 14th Amendment parental interference cause of action;
2. For punitive damages against the individual defendants in an amount to be proven at trial;
3. For interest;
4. For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and per the Bane Act's attorney fees provision
5. For such further other relief as the Court may deem just, proper, and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

Date: October 23, 2026 THE SEHAT LAW FIRM, PLC

By: */s/ Jeffrey Mikel*________
Cameron Sehat, Esq.
Jeffrey Mikel, Esq
Attorneys for Plaintiff,
Justin J. Goss and Crystal
Branquinho